**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2220**

FEMINIST MAJORITY FOUNDATION; FEMINISTS UNITED ON CAMPUS; PAIGE MCKINSEY; JULIA MICHELS; KELLI MUSICK; JORDAN WILLIAMS; ALEXIS LEHMAN,

          Plaintiffs – Appellants,

    v.

RICHARD HURLEY, Former President of University of Mary Washington; TROY PAINO, Current President of University of Mary Washington; UNIVERSITY OF MARY WASHINGTON,

          Defendants – Appellees.

------------------------------

NATIONAL WOMEN'S LAW CENTER et al.; NATIONAL EDUCATION ASSOCIATION,

          Amici Supporting Appellant,

FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION; CATO INSTITUTE; NATIONAL COALITION AGAINST CENSORSHIP; NADINE STROSSEN; ELECTRONIC FRONTIER FOUNDATION,

          Amici Supporting Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  John A. Gibney Jr., District Judge.  (3:17-cv-00344-JAG)

Argued:  May 8, 2018                     Decided:  December 19, 2018

Before KING, AGEE, and HARRIS, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Harris joined. Judge Agee wrote an opinion dissenting in part and concurring in part.

---

**ARGUED**: Erwin Chemerinsky, UNIVERSITY OF CALIFORNIA SCHOOL OF LAW, Berkeley, California, for Appellants. Samuel Thurston Towell, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF**: Debra S. Katz, Lisa J. Banks, Carolyn L. Wheeler, KATZ, MARSHALL & BANKS, LLP, Washington, D.C.; Tim Schulte, SHELLEY CUPP SCHULTE, P.C., Richmond, Virginia, for Appellants. Neena Chaudhry, Emily Martin, Sunu Chandy, Alexandra Brodsky, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Cathy A. Harris, Daniel Clark, KATOR, PARKS, WEISER & HARRIS, P.L.L.C., for Amici National Women's Law Center, et al. Alice O'Brien, Eric A. Harrington, Amanda L. Shapiro, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., for Amicus National Education Association. Sophia Cope, Corynne McSherry, David Greene, Adam Schwartz, Aaron Mackey, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California, for Amicus Electronic Frontier Foundation. Charles M. Henter, HENTERLAW PLC, Charlottesville, Virginia, for Amici Foundation for Individual Rights in Education, Cato Institute, National Coalition Against Censorship, and Nadine Strossen.

---

KING, Circuit Judge:

Plaintiffs Feminist Majority Foundation, Feminists United on Campus, and several Feminists United members appeal from the district court's dismissal of their civil action, filed pursuant to Title IX of the Education Amendments of 1972, as well as 42 U.S.C. § 1983. *See Feminist Majority Found. v. Univ. of Mary Wash.*, 283 F. Supp. 3d 495 (E.D. Va. 2017). The plaintiffs seek the reinstatement of three claims: a Title IX sex discrimination claim against the University of Mary Washington ("UMW," or the "University"); a Title IX retaliation claim against UMW; and a § 1983 claim against UMW's former president, Dr. Richard Hurley, for violating the Equal Protection Clause of the Fourteenth Amendment. *See Feminist Majority Found. v. Univ. of Mary Wash.*, No. 3:17-cv-00344 (E.D. Va. June 9, 2017), ECF No. 13 (the "Complaint"). As explained below, we affirm the dismissal of the § 1983 claim and part of the Title IX retaliation claim. We vacate, however, the dismissal of the Title IX sex discrimination claim and the balance of the retaliation claim. We therefore remand for further proceedings.

I.

A.

Because the district court dismissed the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, we accept and recite the alleged facts in the light most favorable to the plaintiffs. *See Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 524 (4th Cir. 2017). Plaintiff Feminists United is a student organization at UMW

3

and a local affiliate of plaintiff Feminist Majority Foundation, a national organization. During the 2014-2015 academic year, plaintiffs Paige McKinsey, Julia Michels, Kelli Musick, Jordan Williams, and Alexis Lehman were UMW students who served on Feminists United's executive board.

1.

In November 2014, UMW's student senate voted to authorize male-only fraternities at the University. During a campus town hall meeting following the senate's authorization, Feminists United members questioned the wisdom of having such fraternities at UMW, in light of "research that showed that Greek life on campus increased the number of [on-campus] sexual assaults." *See* Complaint ¶ 21. Plaintiff McKinsey was particularly troubled by the vote of approval, and she believed that UMW had failed to support victims of sexual assault in the past. Soon after the town hall meeting, UMW students debated the Greek life vote on Yik Yak, a now-defunct social media application. Yik Yak allowed its users within a limited geographic range to create and view anonymous messages known as "Yaks." Within the Yik Yak conversational thread available at UMW, several students expressed — in offensive terms — strong criticism of Feminists United and its members for their opposition to on-campus fraternities.[1]

---

[1] Although the Yaks discussed herein were posted anonymously, the Complaint alleges — and we accept — that UMW students created the Yaks. *See* Complaint ¶¶ 22, 84, 88; *Simply Wireless, Inc.*, 877 F.3d at 524. According to the Complaint, a Yik Yak user could only view and respond to Yaks created by other users within a 1.5-mile radius. The Complaint alleges that, because the offending Yaks were created within the
(Continued)

On November 21, 2014, several Feminists United members met with UMW's Title IX coordinator, Dr. Leah Cox, to explain their concerns about the University's past failures in responding to student sexual assault complaints. As the Feminists United members walked home from the meeting, other UMW students drove by and screamed, "Fuck the feminists!" *See* Complaint ¶ 24.

Two days later, on November 23, a UMW student videotaped members of the UMW men's rugby team performing a chant that glorified violence against women, including rape and necrophilia.[2] Later that month, the student who recorded the rugby team video provided it to the UMW administration and informed plaintiff McKinsey about the video. Members of Feminists United subsequently met with then-President Hurley to discuss the rugby team's offensive chant. They were assured by Hurley that some unspecified "action" was being taken in response thereto. *See* Complaint ¶ 27.

Despite President Hurley's assurances, plaintiff McKinsey perceived that UMW's administration was indifferent to the rugby team's chant and other discriminatory acts suffered by female students on campus. On January 29, 2015, McKinsey published an opinion piece in UMW's student newspaper explaining "[w]hy UMW is not a feminist

---

geographic range of the University's campus and concerned events thereon, it is clear that the Yaks were authored by UMW students.

[2] Necrophilia generally refers to sexual intercourse with, or attraction towards, dead bodies. The repulsive rugby team chant included the following: "Finally found a whore/she was right and dead/well God damn son of a bitch we're gonna get it in. . . . Finally got it out/it was red and sore/moral of the story is never fuck a whore." *See* Complaint ¶ 25.

friendly campus." *See* Complaint ¶ 28. McKinsey therein discussed the rugby team's chant and recent harassing and threatening Yaks aimed at Feminists United members. That article, however, was not well-received by some members of the UMW community and "led to an escalation of verbal assaults and cyber-attacks on members of Feminists United." *Id.* ¶ 29. For example, various comments of a "derogatory, sexist, and threatening" nature were posted to the school newspaper's website. *Id.* ¶ 85.

On February 20, 2015, members of the UMW men's rugby team approached plaintiff McKinsey in the University's dining hall and confronted her about the newspaper article. That same day, McKinsey informed Dr. Cox — UMW's Title IX coordinator — that McKinsey felt unsafe on the UMW campus after her encounter with the rugby team members, particularly in light of the threats lodged against her and other Feminists United members on Yik Yak and the school newspaper's website. McKinsey requested that the UMW administration take "some sort of action." *See* Complaint ¶ 32.

Dr. Cox responded to plaintiff McKinsey on February 24, informing McKinsey that Cox did not know what actions UMW would take against the men's rugby team. Cox offered, however, to schedule a mediated discussion between the rugby team and Feminists United. About that time, a UMW professor — concerned with the threatening nature of recent Yik Yak posts — emailed various Feminists United members to request their participation in what the professor called "listening circles." *See* Complaint ¶ 34. As proposed, UMW students, including Feminists United members, would meet with UMW faculty and administrators in small groups and explain how the offending Yaks were affecting them.

6

On March 11, 2015, UMW held an open forum about sexual assault on campus, at which President Hurley downplayed the seriousness of the rugby team's chant. Several days later, plaintiff Michels emailed Hurley and notified him that she planned to release a transcript of the rugby team's chant to UMW's student newspaper because the administration had not yet punished those responsible for it. Michels reiterated that Feminists United members felt unsafe on campus. In response, Hurley disclosed that some students had been sanctioned for their participation in the repulsive chanting and that those sanctions had been appealed. Hurley added that he took student safety concerns "quite seriously." *See* Complaint ¶ 39.

About a week after the open forum, President Hurley emailed the UMW student body, "generally discussing UMW's efforts to end sexual assault, violence against women, and others forms of discrimination and harassment." *See* Complaint ¶ 41. Without referencing the rugby team's chant or any other specific acts, Hurley described certain students' recent behavior as "repugnant and highly offensive." *Id.* That same day, Hurley met with several Feminists United members, who questioned why Hurley's email to the student body had not mentioned the rugby team's repulsive chant or the sanctions imposed on the students who had participated therein. Hurley responded that he was following his lawyer's advice and that "he would rather rely on the student grapevine to spread the word about what happened with the rugby team and why." *Id.* ¶ 42.

On March 19, 2015, after several UMW students expressed outrage on Facebook over the rugby team's chant, President Hurley announced that all rugby activities had

been suspended indefinitely and that the rugby players would be required to participate in anti-sexual assault and violence training. Immediately after Hurley's announcement, a flurry of harassing and threatening Yaks were directed at members of Feminists United, blaming them for the rugby team's suspension. The Yaks named plaintiffs McKinsey and Musick, along with Feminists United member Grace Mann, and contained threats of physical and sexual violence. By way of example, the Yaks threatened:

- "Gonna tie these feminists to the radiator and [g]rape them in the mouth";[3]

- "Dandy's about to kill a bitch . . . or two"; and

- "Can we euthanize whoever caused this bullshit?"

*See* Complaint ¶ 46 (alterations in original). Several of the offending Yaks, as alleged in the Complaint, also referred to Feminists United members by such terms as "femicunts, feminazis, cunts, bitches, hoes, and dikes." *Id.*

In addition to naming plaintiff McKinsey, some of the offending Yaks shared her whereabouts so that she could personally be confronted. After McKinsey agreed to speak at the March 24, 2015 meeting of UMW's Young Democrats Club, an anonymous poster shared McKinsey's schedule and outlined a plan to accost her at that meeting. Although McKinsey had already notified UMW administrators about her safety concerns and had

---

[3] In reciting the Yak that threatens to "[g]rape them in the mouth," the Complaint places brackets around the "g" in "[g]rape" and does not define or describe the term. In context and viewed in the light most favorable to the plaintiffs, however, the Yak constituted a threat to rape Feminists United members. According to one of the amicus submissions, the word "grape" as used in the Yak means "gang rape."

8

not received a satisfactory response, the anonymous Yak revealing the plan to confront McKinsey prompted her to contact UMW's campus police and report that she felt unsafe attending the Young Democrats meeting. The campus police believed the threat serious enough to assign an officer to the Feminists United and Young Democrats meetings that evening.

On March 25, plaintiff Michels sent an email to President Hurley, Dr. Cox, and UMW's vice president, Douglas Searcy. The email explained that Feminists United members had documented "nearly 200 examples of students using Yik Yak to post either violent, vitriolic hate or threats against [them]," and that they feared for their safety on the UMW campus. *See* Complaint ¶ 49. Michels therein requested a meeting between Feminists United and the UMW administration to address the Feminists United members' safety concerns. As a result, Cox, Searcy, and other UMW employees met with Feminists United members the next day. The members then requested that the UMW administration take a number of steps. Those requests included: (1) contacting Yik Yak to have the Yik Yak application disabled on UMW's campus;[4] (2) barring access to Yik Yak on UMW's wireless network; (3) communicating "more transparent[ly]" with students; (4) announcing to UMW's student body that Feminists United "had no role in . . . [UMW's] decision [to suspend rugby activities];" and (5) hosting an "assembly to

---

[4] According to the Complaint, disabling Yik Yak at UMW was "possible because of [Yik Yak's] geographic function." *See* Complaint ¶ 50. In other words, UMW could have asked Yik Yak to create a virtual boundary around its campus that blocked users from accessing the application.

9

explain rape culture and discuss harassment, cyber bullying[,] and social media issues." *Id.* ¶ 50.

Rather than grant the requests of Feminists United, Dr. Cox sent a schoolwide email on March 27, 2015, addressing the University's recent cyber bullying issues. Cox asserted that nothing could be done, that is, the University had "no recourse for such cyber bullying." *See* Complaint ¶ 51. Instead, she encouraged UMW students to report any threatening online comments to Yik Yak or other platforms where such comments were made. Disappointed with Cox's approach to the ongoing threats, plaintiff Michels responded and urged Cox and UMW administrators to "take the lead against this problem." *Id.* ¶ 53.

On March 30, 2015, following plaintiff Michels's response to Dr. Cox, another member of Feminists United emailed President Hurley and suggested that UMW's hands-off response to the offending Yaks had contravened the statutory mandate of Title IX. By that time, more than 700 harassing and threatening Yaks had been directed at Feminists United and its members. According to the email to Hurley, Feminists United members had reported the offending posts to Yik Yak for several months, but to no avail. The emailer described feeling so unsafe at UMW that she could not concentrate on her classwork.

A day later, on March 31, Feminists United members held a march on the UMW campus to raise awareness about campus rape. At its conclusion, some UMW students and administrators, including President Hurley, gathered to hear plaintiff McKinsey speak. During her speech, McKinsey discussed the various threatening messages posted

on Yik Yak. The following day, McKinsey emailed Hurley and asked whether the University would be taking action on Feminists United's request that students be barred from accessing Yik Yak on UMW's wireless network. Hurley responded that he had discussed the option of banning Yik Yak with "several experts" and was concerned about violating the First Amendment. *See* Complaint ¶ 59. Dr. Cox echoed Hurley's First Amendment concerns in a subsequent email to a Feminists United member. She added that if any student felt threatened by an "identified member[] of [the] community," the student should contact Cox or the campus police. *Id.* ¶ 60.

On April 8, 2015, plaintiffs McKinsey and Michels met with President Hurley and other UMW administrators at the first of two listening circles to discuss the voluminous harassing and threatening posts on Yik Yak. Michels stressed that several Feminists United members felt they were in danger on the UMW campus, especially those students who had been named in the Yaks. Once again, UMW administrators failed to take any action in response to the harassment and threats.

About a week later, Feminists United members and University administrators, including Dr. Cox, attended the second listening circle. The Feminists United members again expressed concerns about the offending Yaks and requested that UMW address the hostile campus atmosphere. A UMW professor recommended that the University provide "better training" and engage in "more transparency and communication at all levels." *See* Complaint ¶ 64. Dr. Cox responded, however, that "such solutions would violate privacy rights," and she otherwise failed to offer any plan to address the harassment and threats suffered by Feminists United members. *Id.*

11

On April 17, 2015 — in an event later determined to be unrelated to the offending Yaks — UMW student and Feminists United member Grace Mann was killed by another student who was her roommate. During the immediate aftermath of that terrible event, Feminists United members were unaware that it had no apparent connection to the harassing and threatening Yaks. Mann's demise prompted one Feminists United member to send an email to UMW administrators chastising the University for its failure to respond to the Yik Yak bullying and threats. UMW administrators did not respond to that email.

2.

On May 7, 2015, the plaintiffs filed a complaint with the Department of Education's Office of Civil Rights (the "OCR complaint"), alleging that UMW had contravened Title IX by failing to address the hostile environment at the University resulting from the sexually harassing and threatening online posts. The plaintiffs also held a press conference on UMW's campus to announce the OCR complaint. That same day, UMW issued a statement denying the allegations in the OCR complaint. After the University's denials, several messages were posted on Yik Yak that again harassed Feminists United members, and also criticized the filing of the OCR complaint.

About a month later, on June 8, 2015, President Hurley wrote to the president of the Feminist Majority Foundation addressing the OCR complaint. He promptly distributed copies of his responsive letter to the UMW community and several media outlets. According to the Complaint, Hurley's letter falsely asserted that the OCR complaint drew a connection between Grace Mann's death and the threatening social

media posts. Hurley also inaccurately claimed that neither UMW nor its campus police had received any reports of Yik Yak threats directed at Feminists United members. Additionally, Hurley suggested that the safety concerns of Feminists United members were exaggerated because some of the online threats simply derived from "pop culture." *See* Complaint ¶ 73.

In the wake of President Hurley's June 2015 letter, additional harassing and threatening messages were directed at Feminists United members on Yik Yak. Similar Yaks continued to be posted throughout the summer of 2015. According to the Complaint, "[t]he [new] posts expressed a sense of validation regarding the earlier posts along with a newfound sense of outrage toward Feminists United for filing their OCR [complaint]." *See* Complaint ¶ 74. The plaintiffs thereafter amended the OCR complaint to allege retaliatory conduct by UMW.

B.

In May 2017, the plaintiffs withdrew the OCR complaint and initiated this lawsuit in the Eastern District of Virginia, alleging, inter alia, the three claims now on appeal. First, the Complaint alleges that UMW contravened Title IX by being deliberately indifferent to student-on-student sex discrimination (the "sex discrimination claim"). In support of the sex discrimination claim, the Complaint specifies that UMW's deliberate indifference served to create and foster a campus atmosphere so hostile that Feminists United members refrained from leaving their homes, attending classes, and participating in campus events. Second, the Complaint alleges that UMW retaliated against the plaintiffs for advocating against sexual assault and reporting sexual harassment, also in

13

violation of Title IX (the "retaliation claim"). According to the Complaint, UMW retaliated against the plaintiffs in two ways: (1) the University was deliberately indifferent to UMW students harassing and threatening members of Feminists United for engaging in protected conduct; and (2) President Hurley prepared and released his June 2015 letter, which made false accusations against — and was intended to disparage — members of Feminists United. Third, under § 1983 of Title 42, the Complaint alleges that Hurley infringed on the plaintiffs' equal protection rights under the Fourteenth Amendment (the "equal protection claim"). The Complaint alleges that Hurley contravened the plaintiffs' equal protection rights by, inter alia, failing to act against those UMW students who had sexually harassed members of Feminists United.[5]

The defendants promptly moved to dismiss the Complaint under Rule 12(b)(6), asserting that it fails to state a claim upon which relief can be granted. President Hurley also maintained that he is entitled to qualified immunity on the equal protection claim. By its decision of September 19, 2017, the district court granted Hurley qualified immunity and dismissed the Complaint. *See Feminist Majority Found.*, 283 F. Supp. 3d at 502-03. The plaintiffs have timely appealed the district court's judgment of dismissal, and we possess appellate jurisdiction pursuant to 28 U.S.C. § 1291.

---

[5] The Complaint also advanced a fourth claim, an equal protection claim against UMW's current president, Troy Paino. The district court's dismissal of that claim is not challenged on appeal.

## II.

We review de novo a district court's decision to grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Rockville Cars, LLC v. City of Rockville, Md.*, 891 F.3d 141, 145 (4th Cir. 2018). In conducting such a review, we are obliged to accept the complaint's factual allegations as true and draw all reasonable inferences in favor of the plaintiffs. *See Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018). A district court can properly grant a Rule 12(b)(6) dismissal only if the complaint fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We likewise review de novo a district court's qualified immunity ruling. *See Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

## III.

As heretofore explained, the plaintiffs appeal the district court's dismissal of three claims. We will first address and resolve the Title IX sex discrimination and retaliation claims, respectively. We will then consider and decide the § 1983 equal protection claim, which requires an assessment of President Hurley's assertion of qualified immunity.

### A.

#### 1.

Beginning with the plaintiffs' sex discrimination claim against UMW, we recognize that Title IX provides, in relevant part, that "[n]o person . . . shall, on the basis

of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *See* 20 U.S.C. § 1681(a). The Supreme Court has concluded that a victim of sex discrimination is entitled to pursue a private cause of action against a federally-funded educational institution for a violation of Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979). Nearly twenty years ago, in *Davis v. Monroe County Board of Education*, the Court explained that sexual harassment constitutes "discrimination" within the meaning of Title IX. *See* 526 U.S. 629, 649-50 (1999). The Court also then recognized that a covered institution can be liable under Title IX for its "deliberate indifference to known acts of [student-on-student sexual] harassment in its programs or activities," if that harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633. An educational institution can only be liable for student-on-student sexual harassment, however, when the institution "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645.

The *Davis* Court acknowledged that educational institutions have a great deal of "flexibility" in disciplining students who sexually harass other students. *See* 526 U.S. at 648. Therefore, an institution is not normally liable for failing to cede to a harassment victim's specific remedial demands. *Id.* Nor is an institution subject to Title IX liability when it "refrain[s] from a form of disciplinary action that would expose it to constitutional or statutory claims." *Id.* at 649. That said, when the institution's response — or lack thereof — to known student-on-student sexual harassment is "clearly

16

unreasonable," the institution has contravened Title IX. *Id.* at 648; *see S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 77 (4th Cir. 2016).

Consistent with the Supreme Court's *Davis* decision, we have recognized that, to succeed on a Title IX claim premised on sexual harassment, a plaintiff must satisfy four elements. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc). Those elements are: (1) that the educational institution receives federal funds; (2) that the plaintiff "was subjected to harassment based on her sex"; (3) that "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity"; and (4) that "there is a basis for imputing liability to the institution." *Id.*

2.

The University has not disputed the sufficiency of the Complaint on the first, second, and third elements identified in our *Jennings* decision. That is, the Complaint sufficiently alleges that: (1) UMW receives federal funds; (2) many of the harassing and threatening Yaks targeted the plaintiff Feminists United members on the basis of sex; and (3) those Yaks, along with other online posts and in-person interactions, created a hostile and abusive environment. But UMW maintained below — and the district court agreed — that the Title IX sex discrimination claim fails as a matter of law on the fourth element of *Jennings*; that is, it lacks a basis for imputing liability to UMW.

The district court explained that the sexual harassment endured by members of Feminists United "took place in a context over which UMW had limited, if any, control." *See Feminist Majority Found.*, 283 F. Supp. 3d at 501. Furthermore, the court concluded

17

that UMW was not deliberately indifferent to such harassment because it "t[ook] some action," including coordinating listening circles and sending a campus police officer to attend two student events. *Id.* To the extent the plaintiffs faulted UMW for failing to respond to the harassment in their preferred manner, the court observed that "Title IX does not require [a university] to meet the particular remedial demands of its students." *Id.* The court also emphasized that one of those demands — "banning Yik Yak from the campus wireless network" — might expose the University to First Amendment liability. *Id.*

3.

On appeal, the plaintiffs maintain that the Complaint sufficiently alleges a Title IX claim for sex discrimination, including the fourth element, i.e., a basis for imputing liability to UMW. According to the plaintiffs, their allegations reflect that UMW had substantial control over both the context in which the student-on-student harassment occurred and those students who harassed Feminists United members. The plaintiffs also maintain that the Complaint adequately alleges UMW's deliberate indifference to such sexual harassment and specifies several ways the University could have responded without implicating the First Amendment. We must therefore focus on and resolve the crux of the sex discrimination claim: whether the Complaint sufficiently alleges a basis for imputing liability to UMW.

a.

The district court determined that UMW had little — if any — control over the context in which the Feminists United members were harassed, because nearly all of that

18

harassment occurred through Yik Yak. We are satisfied, however, that the court's decision in that regard is undermined by the Complaint's factual allegations. In so ruling, we remain mindful that the Supreme Court's *Davis* decision limits an educational institution's Title IX liability for student-on-student sexual harassment to those situations where the defendant institution "exercises substantial control over both the harasser and the context in which the known harassment occurs." *See* 526 U.S. at 645.

We begin the substantial control analysis by identifying the context in which the sexual harassment occurred and UMW's control over that context. The Complaint alleges that much of the harassment occurred through Yik Yak. Although that harassment was communicated through cyberspace, the Complaint shows that UMW had substantial control over the context of the harassment because it actually transpired on campus. Specifically, due to Yik Yak's location-based feature, the harassing and threatening messages originated on or within the immediate vicinity of the UMW campus. In addition, some of the offending Yaks were posted using the University's wireless network, and the harassers necessarily created those Yaks on campus. Moreover, the harassment concerned events occurring on campus and specifically targeted UMW students. *See Davis*, 526 U.S. at 646 ("Where . . . the misconduct occurs during school hours and on school grounds[,] . . . the [educational institution] retains substantial control over the context in which the harassment occurs."); *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 573 (4th Cir. 2011) (observing "that speech originating outside of the schoolhouse gate but directed at persons in school and received by and acted on by them [may] in fact [constitute] in-school speech").

19

Furthermore, to the extent the sexual harassment was communicated through UMW's wireless network, the Complaint alleges that the University could have disabled access to Yik Yak campuswide. The Complaint also alleges that the University could have sought to identify those students using UMW's network to harass and threaten Feminists United members. If the University had pinpointed the harassers, it could then have circumscribed their use of UMW's network. Indeed, it is widely known that a university can control activities that occur on its own network. A university may, for example, bar a student caught downloading music or movies in violation of copyright laws from accessing its network. *See* 20 U.S.C. § 1094(a)(29)(A) (requiring educational institutions to "develop[] plans to effectively combat the unauthorized distribution of copyrighted material" in exchange for federal funds).

Beyond the University's technical capacity to control the means by which the harassing and threatening messages were transmitted, the Complaint demonstrates that UMW could have exercised control in other ways that might have corrected the hostile environment. For instance, UMW administrators could have more clearly communicated to the student body that the University would not tolerate sexually harassing behavior either in person or online. The University also could have conducted mandatory assemblies to explain and discourage cyber bullying and sex discrimination, and it could have provided anti-sexual harassment training to the entire student body and faculty. In these circumstances, we are satisfied that the Complaint sufficiently alleges UMW's substantial control over the context in which the alleged harassment occurred.

20

The substantial control analysis also requires us to consider the educational institution's control over the harasser, especially its "disciplinary authority." *See Davis*, 526 U.S. at 647. Under the Complaint, UMW had the ability to punish those students who posted sexually harassing and threatening messages online. Indeed, the Complaint recounts that UMW had previously disciplined students — members of the men's rugby team — for derogatory off-campus speech. If UMW could punish students for offensive off-campus speech that was not aimed at any particular students, the University also could have disciplined students for harassing and threatening on-campus speech targeted at Feminists United members. In fact, according to the Complaint, Dr. Cox actually advised Feminists United members to contact her if they felt threatened by an "identified member[] of [the] community." *See* Complaint ¶ 60. Viewed in the proper light, Cox's statement demonstrates UMW's capacity to exercise control over students engaging in threatening online behavior.

To the extent the University contends it was unable to control the harassers because the offending Yaks were anonymous, we readily reject that proposition. The Complaint alleges that the University never sought to identify the students who posted the offending messages on Yik Yak, even though some of those messages were facilitated by (i.e., posted through the use of) UMW's network. Nor did the University ever ask Yik Yak to identify those users who had harassed and threatened UMW students. The University cannot escape liability based on facially anonymous posts when, according to the Complaint, UMW never sought to discern whether it could identify the harassers.

21

At bottom, in assessing whether UMW — under the Complaint — had sufficient control over the harassers and the context of the harassment, we cannot conclude that UMW could turn a blind eye to the sexual harassment that pervaded and disrupted its campus solely because the offending conduct took place through cyberspace. *See Kowalski*, 652 F.3d at 572-74 (rejecting student's First Amendment challenge to high school's disciplinary action taken against student who, off campus, created website to bully classmate). Rather, we are satisfied that the Complaint sufficiently alleges that UMW could exert substantial control over the context in which the harassment occurred and could exercise disciplinary authority over those UMW students who sexually harassed and threatened the Feminists United members.[6]

b.

The district court also ruled that the sex discrimination claim fails because the Complaint does not sufficiently allege UMW's deliberate indifference to sexual harassment. We again disagree. Simply put, the Complaint demonstrates that — although UMW was not entirely unresponsive to allegations of harassment — the

---

[6] In his opinion dissenting in part, our distinguished colleague Judge Agee asserts that the University does not have sufficient control over the context of the harassment and the harassers. This assertion highlights, however, that his dissent pays only lip service to the Rule 12(b)(6) standard and entirely fails to adhere to it. That is, our good friend refuses to view the facts in the light most favorable to the plaintiffs and to draw all reasonable inferences in their favor. In fact, the dissent draws the inferences against the plaintiffs and goes well beyond the Complaint's allegations, venturing outside of the record on appeal in an effort to actually disprove those allegations. *See post* at 66-67, 78. And — without recognizing the irony — the dissent makes unwarranted accusations of results-oriented decisionmaking with respect to our faithful recitation of the Complaint's allegations. *See id.* at 66.

University did not engage in efforts that were "reasonably calculated to end [the] harassment." *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012). Indeed, the Complaint portrays repeated instances of UMW students targeting and harassing Feminists United members with threats and other sex-based hostility. Those harassing activities were reported to the University on multiple occasions over many months. UMW's administrators, however, merely responded with two listening circles, a generic email, and by sending a campus police officer with a threatened student on one evening after particularly aggressive and targeted Yaks.

The University faces serious difficulties in its effort to convince us that the Complaint does not sufficiently allege deliberate indifference. The pertinent facts include the following:

- In November 2014, UMW students began harassing Feminists United members through Yik Yak for opposing the creation of fraternities at UMW;

- In February 2015, plaintiff McKinsey informed Dr. Cox that she felt unsafe on the UMW campus because of the harassing and threatening online posts directed at her, as well as her in-person interactions with members of the rugby team;

- In March 2015, McKinsey and plaintiff Michels reported ongoing safety concerns to President Hurley on behalf of themselves and other Feminists United members;

- After Hurley's March 19, 2015 announcement that the rugby team would be suspended indefinitely, a flurry of harassing and threatening Yaks were aimed at Feminists United members;

- The offending Yaks threatened to "euthanize," "kill," and "[g]rape," Feminists United members, named specific members, and reported McKinsey's locations on the UMW campus with the goal that she be confronted. *See* Complaint ¶ 46. Those Yaks were

23

sufficiently concerning that the UMW campus police assigned an officer to two student events McKinsey attended;

- Additional offending Yaks continued throughout March 2015. By the end of that month, more than 700 harassing and threatening posts had been directed toward members of Feminists United;

- Although Feminists United members notified UMW administrators about those messages and their safety concerns, Cox announced that the University had "no recourse" for such online harassment, *see* Complaint ¶ 51;

- In April 2015, in two listening circles, Feminists United members again reported to UMW administrators that they felt unsafe on campus as a result of the offending Yaks; and

- Thereafter, offending Yaks continued to be posted throughout the summer of 2015. The University, however, never investigated the harassment and threats, and never asked any law enforcement agencies to investigate them.

On the allegations of the Complaint, we are satisfied that the plaintiffs sufficiently allege that UMW exhibited deliberate indifference to known instances of sexual harassment. Although the Complaint acknowledges that UMW took limited steps in response to the harassing and threatening Yaks, those actions do not preclude Title IX liability at this stage. *See Davis*, 526 U.S. at 649 (recognizing that court may determine, in appropriate situation, that institution did not act with deliberate indifference as matter of law). UMW's decision to have a campus police officer at two student meetings was a short-term countermeasure — a one-off — that failed to address the more than six-month harassment campaign directed at Feminists United and its members. *See Zeno*, 702 F.3d at 669. Moreover, viewed in the proper light, UMW's position is undermined by the fact

that its campus environment was such that a police officer's presence was necessary at two student meetings.

As for the listening circles, we agree that university administrators listening to students' reports of harassment and threats is an important step in seeking to rectify a sexually hostile environment. But the mere act of listening to students is not a remedy in and of itself. *See S.B. ex rel. A.L.*, 819 F.3d at 77 (observing that "half-hearted investigation or remedial action" is insufficient to shield school from Title IX liability). Significantly, after the Feminists United members placed the UMW administration on notice of the hostile environment permeating the campus, the University made no real effort to investigate or end the harassment and threats contained in the Yaks. *See Davis*, 526 U.S. at 654 (recognizing that deliberate indifference can be shown through failure to investigate or failure to attempt to remedy harassment); *Jennings*, 482 F.3d at 701 (explaining that a "[u]niversity's failure to take any action to remedy the [harassment] would allow a rational jury to find deliberate indifference to ongoing discrimination"); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (recognizing that educational institution "must respond" to report of sexual harassment); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248 (10th Cir. 1999) (observing that failure to investigate complaint of sexual assault constitutes deliberate indifference).

Rather than seeking to end the online harassment and threats, Dr. Cox — as UMW's Title IX coordinator — simply advised the Feminists United members that the University was powerless to address the offending conduct. President Hurley likewise declined to take any meaningful action to curtail the online harassment and publicly

25

downplayed the seriousness of the threats aimed at the Feminists United members. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (recognizing that school is deliberately indifferent where it makes "official decision" not to remedy Title IX violation). Under the Complaint, we are therefore unable to conclude at the pleading stage that UMW's response to the sexual harassment of Feminists United members was not "clearly unreasonable." *See Davis*, 526 U.S. at 648.

c.

In its deliberate indifference analysis, the district court also agreed with the University that the First Amendment circumscribed UMW's ability to respond to the online harassment and threats suffered by the plaintiffs. On appeal, the University maintains that two actions requested by the plaintiffs implicate the First Amendment, namely that students be punished for their speech, and that students be barred from accessing Yik Yak on UMW's wireless network. As explained below, First Amendment concerns do not render the University's response to the sexual harassment and threats legally sufficient for two sound reasons: (1) true threats are not protected speech, and (2) the University had several responsive options that did not present First Amendment concerns.

(1)

We first address the University's expressed apprehension about punishing students for their speech. Put simply, we are satisfied that its First Amendment concerns about penalizing speech lack a proper basis. The University could have vigorously responded to the threatening Yaks without implicating the First Amendment because "true threats"

26

are not protected speech. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (recognizing that "true threats" are not constitutionally protected and describing them as "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals").[7]

The Supreme Court and our Court have consistently recognized the principle that threatening speech is not protected by the Constitution. *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 707 (1969) (upholding constitutionality of statute making it illegal to threaten president with physical violence); *United States v. Maxton*, 940 F.2d 103, 105-06 (4th Cir. 1991) ("Threats to kidnap or injure persons are legislatively proscribable, falling within that group of expressions, such as fighting words, which are not constitutionally protected pure speech." (internal quotation marks omitted)). Moreover, both federal law and Virginia law criminalize the communication of threats to kill or injure others. *See* 18 U.S.C. § 875(c) (prohibiting transmission through interstate commerce of threat to injure another); Va. Code Ann. § 18.2-60(A)(1) (criminalizing electronic communication of threat to kill or injure another if threat recipient is placed "in reasonable apprehension of death or bodily injury").

---

[7] Although we focus on the University's ability to punish threatening speech, we do not foreclose the possibility that UMW could also punish students for harassing speech that was nonthreatening. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

Our 2007 decision in *United States v. Bly* is instructive on the unprotected and criminal nature of threatening speech. *See* 510 F.3d 453 (4th Cir. 2007). In *Bly*, the grand jury charged the defendant with contravening 18 U.S.C. § 876(b), which makes it illegal to mail a letter containing a threat of violence in an effort to extort something of value from another. Bly — a disgruntled former doctoral student at the University of Virginia — mailed a letter to persons affiliated with that great institution, including its President, demanding that the university create a specific engineering program for Bly and remedy perceived improprieties in its doctoral degree process. Bly's letter detailed his purported proficiency with firearms, and he therein threatened to injure specific faculty members. We affirmed Bly's § 876(b) conviction and sentence, explaining that true threats, such as those in Bly's letter, are not constitutionally protected. In assessing whether Bly's statements constituted true threats, we emphasized that Bly targeted specific individuals and that he "implicitly and explicitly promised violent retribution." *Id.* at 459.

The threats described in the plaintiffs' Complaint are similar to the threats made in *Bly*: specific targets are identified and violent actions are vowed. For example, the Complaint alleges that threatening Yaks named Feminists United members and identified plaintiff McKinsey's locations on campus. The Complaint asserts that some of the Yaks threatened to "euthanize," "kill," and "[g]rape" Feminists United members. *See* Complaint ¶ 46. Although the University contends that the Yaks quoted in the Complaint do not constitute "true threats" because many of them reference "pop culture," we are entirely unpersuaded. A reasonable person would not be assuaged by the fact that a

28

threat of violence included a popular culture reference. *See Maxton*, 940 F.2d at 106 (explaining that reasonable person standard applies in considering whether communication is "true threat"). That is particularly true here, where the backdrop of the threatening messages is a campus environment purportedly conducive to sexual assault, and those messages target persons by name and location. In any event, the Complaint also alleges that there were other "potentially criminal" threatening Yaks, *see* Complaint ¶ 83, and "[g]enerally, what is or is not a true threat is a jury question," *see United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990).

Moreover, although the student culprits in these proceedings made their threats through an anonymous messaging application, the anonymity of the threats does not excuse UMW's deficient response. We are satisfied that the University was obliged to investigate and seek to identify those students who posted the threats and to report the threats to appropriate law enforcement agencies. *See Abbott v. Pastides*, 900 F.3d 160, 173 (4th Cir. 2018) (observing that "this court has made clear, universities have obligations not only to protect their students' free expression, but also to protect their students").[8] Put succinctly, the threats described in the Complaint appear to constitute criminal conduct. Steps should have been promptly taken by the University to solve the "whodunnits," in that the only remaining unknowns with respect to those offenses were

---

[8] As the plaintiffs' counsel posited at oral argument, if an anonymous bomb threat aimed at UMW's campus had been posted to Yik Yak, the University's administrators would have done anything possible to investigate the bomb threat. And they would have promptly reported the threat to law enforcement agencies. We discern no reason why the University should have treated the threats identified in the Complaint any differently.

the identities of the culprits. If UMW or a law enforcement agency had successfully identified the students who posted threatening messages, the offenders could have been disciplined or prosecuted without infringing on the First Amendment. *See Black*, 538 U.S. at 359; *Bly*, 510 F.3d at 458. It should go without saying that the Feminists United members deserved as much protection from threats as the University of Virginia's faculty in the *Bly* case.

(2)

Furthermore, the Complaint alleges that UMW could have taken other steps in response to the harassment that would not have implicated any First Amendment concerns.[9] For example, the University could have more vigorously denounced the harassing and threatening conduct, clarified that Feminists United members were not responsible for the rugby team's suspension, conducted a mandatory assembly of the student body to discuss and discourage such harassment through social media, or hired an outside expert to assist in developing policies for addressing and preventing harassment. Additionally, UMW could have offered counseling services for those impacted by the targeted harassment. To be sure, Title IX required none of those specific actions. *See Davis*, 526 U.S. at 648. Consideration of an educational institution's remedial options, however, inheres in the deliberate indifference analysis. *See S.B. ex rel. A.L.*, 819 F.3d at

---

[9] Because the Complaint alleges that the University could have taken responsive actions outside of barring access to Yik Yak on UMW's wireless network, it is unnecessary for us to decide whether UMW blocking Yik Yak might have contravened the First Amendment.

30

77. In other words, when an educational institution claims that it has done all it can to address instances of sexual harassment and threats, a reviewing court should consider whether the institution failed to take other obvious and reasonable steps. The Complaint thus adequately alleges that UMW could have addressed the harassing and threatening Yaks without exposing itself to First Amendment liability.

d.

At bottom, we are satisfied that the plaintiffs have sufficiently alleged a sex discrimination claim under Title IX, predicated on UMW's deliberate indifference to the specified student-on-student harassment. We will therefore vacate the dismissal of that claim.

B.

1.

Turning to the retaliation claim against UMW, the Supreme Court recognized more than ten years ago that "the private right of action implied by Title IX encompasses claims of retaliation." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005). In *Jackson*, the Court explained that when a federally-funded educational institution "retaliates against a person *because* he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX." *Id.* at 174 (internal quotation marks omitted). The Court, however, has never spelled out the specific elements of such a retaliation claim. Like our sister circuits, we thus apply familiar Title VII retaliation concepts to the requirements of a Title IX retaliation claim. *See Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207

31

(4th Cir. 1994) (recognizing that "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX"); *see also Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014); *Milligan v. Bd. of Tr. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).

At the pleading stage, the plaintiffs are required to sufficiently allege two elements to state a Title IX retaliation claim. First, they must allege that they engaged in protected activity under Title IX, and second, they must allege that — as a result of their protected activity — they suffered an adverse action attributable to the defendant educational institution. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (recognizing, in the context of Title VII, that "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated — or took an adverse employment action — against him, (2) because he has opposed any unlawful employment practice" (internal quotation marks omitted)).

To be actionable, the retaliatory conduct must be "materially adverse"; that is, it must suffice to "dissuade[] a reasonable [person] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). We have recognized — in the Title VII context — that "retaliatory harassment" may constitute a materially adverse action. *See Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001), *abrogated on other grounds by Burlington*

32

*N. & Santa Fe. Ry.*, 548 U.S. at 64. A clear majority of our sister circuits have similarly held that retaliatory harassment, including coworker harassment, can rise to the level of material adversity. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345-47 (6th Cir. 2008) (collecting similar decisions of First, Second, Third, Seventh, Ninth, and Tenth Circuits). *But see Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657-58 (5th Cir. 2012) (ruling that coworker retaliatory harassment is not adverse employment action in Title VII context).

### 2.

The University has not challenged the proposition that the plaintiffs engaged in protected activities under Title IX. Those protected activities included advocating against and reporting sexual harassment, plus filing the OCR complaint. The University did, however, maintain that the plaintiffs failed to allege that UMW took any "retaliatory action" against them, and the district court agreed. *See Feminist Majority Found.*, 283 F. Supp. 3d at 502. To the extent the retaliation claim relies on harassing and threatening Yaks directed at members of Feminists United after they engaged in protected activity, the court ruled that such student-on-student retaliatory harassment cannot legally be attributed to UMW. *Id.* at 502 n.14. Insofar as the plaintiffs predicated their retaliation claim on President Hurley's June 2015 letter, the court deemed the letter not actionable because it "simply responded to the OCR complaint." *Id.* at 502.

### 3.

On appeal, the plaintiffs contend that UMW can be liable for student-on-student harassment that is retaliatory in nature. Additionally, the plaintiffs maintain that

33

President Hurley's June 2015 letter itself constitutes a materially adverse retaliatory action. We address those contentions in turn.

a.

The district court ruled that the aspect of the retaliation claim predicated on student-on-student retaliatory harassment fails as a matter of law. We are compelled to disagree, in light of the principles enunciated by the Supreme Court in its *Davis* and *Jackson* decisions, along with our recognition that retaliatory harassment can be a materially adverse action. Applying those principles, we are satisfied that an educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment. Pursuant to *Davis*, however, the institution can only be liable for such retaliation if it "exercises substantial control over both the [student engaged in retaliatory harassment] and the context in which the known [retaliatory harassment] occurs." *See* 526 U.S. at 645.

The Complaint alleges that Feminists United members engaged in protected activity in three ways: (1) by advocating against "sex-based violence at UMW"; (2) by reporting instances of sexual harassment to the University; and (3) by filing the OCR complaint. *See* Complaint ¶¶ 68, 98. The Complaint further alleges that, in response to those protected activities, other UMW students harassed and threatened them in a manner that would deter a reasonable person from "making or supporting a charge of [sex] discrimination." *See Burlington N. & Santa Fe Ry.*, 548 U.S. at 68.

The Complaint demonstrates that, after plaintiff McKinsey published her newspaper article speaking out against sex discrimination at the University, her fellow

34

UMW students harassed and threatened her on the newspaper website and on Yik Yak. In addition, members of the UMW men's rugby team confronted McKinsey in a manner that rendered her extremely unsettled. Shortly thereafter, in response to President Hurley's announcement that the men's rugby team would be suspended indefinitely, UMW students ramped up their harassing and threatening Yaks against the Feminists United members. Some of the Yaks named specific members of Feminists United, and other Yaks revealed plaintiff McKinsey's locations on UMW's campus. As of March 2015, more than 700 harassing and threatening Yaks had been directed at Feminists United members. When the plaintiffs filed their OCR complaint two months later, they were subjected to another barrage of harassing and threatening Yaks. The Complaint specifies that those types of Yaks continued well into the summer of 2015.

As the Complaint illustrates, Feminists United members promptly reported the foregoing retaliatory conduct to UMW on several occasions. The Complaint alleges that UMW had the ability to control both the students who engaged in retaliatory harassment and the context in which that harassment occurred. *See supra* Section III.A.3.a. The University took little or no action, however, to address and curtail the retaliatory activities. *See supra* Section III.A.3.b. Instead, Dr. Cox actually asserted that the University had "no recourse" for the harassing and threatening behavior of UMW students. *See* Complaint ¶ 51. Because an educational institution can be liable under

35

Title IX for its deliberate indifference to student-on-student retaliatory harassment, we are satisfied that the Complaint sufficiently alleges a retaliation claim against UMW.[10]

As UMW would have it, the retaliation claim merely restates and duplicates the sex discrimination claim. That contention does not acknowledge, however, the propriety of pleading multiple or alternative claims based on the same facts. *See* Fed. R. Civ. P. 8(d)(2). And, in any event, the sex discrimination claim and the retaliation claim are not duplicative. Although both claims rely on student-on-student harassment that occurred after the plaintiffs engaged in protected activities, the sex discrimination claim differs from the retaliation claim because, to prove the latter, the plaintiffs must show a retaliatory motive. *See, e.g.*, *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

The University also argues on appeal that the retaliation claim seeks to hold UMW liable for its students' instantaneous retaliatory conduct, and the University contends that, practically speaking, it could not reasonably be expected to control such conduct. In that regard, we disagree with the University's characterization of the retaliation claim. The Complaint plainly faults UMW for its failure — over several months — to address and

---

[10] Five years ago, in *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *See* 570 U.S. 338, 362 (2013). Neither the Supreme Court nor our Court has resolved the question of whether *Nassar*'s ruling applies to a Title IX retaliation claim, and the parties have not pursued that issue. *But see Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (asserting, without explanation, that *Nassar* applies to Title IX retaliation claim). We need not resolve that issue today because the Complaint sufficiently alleges "but-for" causation.

seek to eliminate retaliatory harassing conduct. Furthermore, as explained in our analysis of the sex discrimination claim, the Complaint alleges UMW's control over the context and the harassers during that period of time. In other words, the retaliatory harassment engaged in by UMW students spanned a sufficient period for the University to have taken reasonable steps to address it.

In sum, if an educational institution can be liable for student-on-student sexual harassment, *see Davis*, 526 U.S. at 646-47, it can also be liable for student-on-student retaliatory harassment, *see Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 811 (M.D. Tenn. 2016). And that principle applies even though the institution's administrators did not personally participate in the harassment. *See Doe*, 186 F. Supp. 3d at 811. Our conclusion comports with the Supreme Court's "repeated holdings construing . . . Title IX broadly," *see Jackson*, 544 U.S. at 174, as well as the Court's recognition that, for antidiscrimination laws to function effectively, retaliation victims must enjoy expansive legal protections, *see Burlington N. & Santa Fe Ry.*, 548 U.S. at 67. We are therefore satisfied that the district court erred in dismissing the retaliation claim, insofar as it is predicated on UMW's deliberate indifference to student-on-student retaliatory harassment.

b.

Turning to the part of the retaliation claim that is predicated on President Hurley's June 2015 letter, we observe that the letter was never filed in the district court. Consequently, that letter is not part of the record on appeal. *See* Fed. R. App. P. 10(a) (providing that the record on appeal includes, inter alia, "the original papers and exhibits

37

filed in the district court"). Additionally, although either party could have sought to correct or modify the record on appeal to include Hurley's letter, they have not done so. *See* Fed. R. App. P. 10(e)(2). In these circumstances, we are constrained to consider only the Complaint's description of the letter.[11]

With that caveat, we agree with the district court that President Hurley's letter — as described in the Complaint — does not constitute a materially adverse action that, in and of itself, can support the retaliation claim. Put simply, an educational institution and its administrators are entitled to defend against accusations of discrimination. *See Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) ("[T]he person or entity accused of discrimination must be allowed to defend himself or itself."). Furthermore, an institution and its administrators can explain their denials of discrimination allegations without fear that those denials might create additional liability. Although we acknowledge that "[t]here is an important difference between defending oneself . . . and threatening, intimidating, or otherwise interfering with someone's right to pursue a

---

[11] Although President Hurley's June 2015 letter was not in the record, the district court apparently obtained it from the internet and considered the letter in dismissing the retaliation claim. Thereafter, the parties included the letter in the Joint Appendix filed on appeal. Rule 30(a)(1) of the Federal Rules of Appellate Procedure, however, limits the joint appendix to "(A) the relevant docket entries in the proceeding below; (B) the relevant portions of the pleadings, charge, findings, or opinion; (C) the judgment, order, or decision in question; and (D) other parts of *the record* to which the parties wish to direct the court's attention." *See* Fed. R. App. P. 30(a)(1) (emphasis added); *see also* 4th Cir. R. 30(b)(1) ("The appendix should . . . contain the final order or order appealed from, the complaint . . . , as well as all other parts of *the record* which are vital to the understanding of the basic issues on appeal." (emphasis added)). Hurley's letter does not fall within any of those provisions.

discrimination claim," the Complaint does not sufficiently allege that Hurley's letter falls within the latter category. *See id.*; *cf. Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (recognizing, in context of First Amendment retaliation claim, that public official's retaliatory speech is actionable where speech constitutes "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow").[12]

According to the Complaint, three aspects of President Hurley's letter support a standalone retaliation claim. First, the Complaint alleges that Hurley falsely asserted that the OCR complaint "drew a 'troubling' connection between [Grace] Mann's death and the Yik Yak threats despite Feminists United's and its counsel's public statements to the contrary." *See* Complaint ¶ 72. The Complaint acknowledges, however, that at least one member of Feminists United claimed that the Mann incident and the Yik Yak posts were related. Consequently, Hurley's assertion in his letter about Mann's death must be

---

[12] The standard for proving a materially adverse action in the Title VII retaliation context — which we apply to a Title IX retaliation claim — is similar to the standard for demonstrating an adverse action in the First Amendment retaliation context. *Compare Burlington N. & Santa Fe Ry.*, 548 U.S. at 68 (explaining that, to be actionable under Title VII, retaliatory action must be severe enough to dissuade reasonable person from reporting discrimination), *with Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." (internal quotation marks omitted)).

viewed as a permissible response to a student's effort to blame UMW for that terrible event.[13]

Second, the Complaint faults President Hurley's letter for downplaying certain Yik Yak threats by emphasizing their use of "pop culture references." *See* Complaint ¶ 73. We agree with UMW, however, that this part of Hurley's letter sought to contextualize those Yaks and, in so doing, served as an assessment of actual danger on the UMW campus. School administrators are entitled to communicate freely with students and faculty regarding the existence and severity of potential safety risks on the school's campus without fear of creating future liability.

Third, the Complaint accuses President Hurley's letter of erroneously asserting that neither UMW nor its campus police had received reports of Yik Yak threats against Feminists United members. Hurley's assertion, however, amounts to little more than a denial of the allegations of discrimination made in the OCR complaint. That is, Hurley again sought to characterize the seriousness of the Yaks and explained his belief that no actual threats against particular students were reported to the University. Even if Hurley's characterization of the Yaks was misguided, he was entitled to defend against the allegations of sex discrimination without running afoul of Title IX anti-retaliation

---

[13] Even now, the Complaint does not unambiguously foreclose a connection between Mann's death and the actions underlying the sex discrimination claim. Although the Complaint appears to disclaim such a connection, it also alleges that Mann's killer is a former member of UMW's rugby team. *See* Complaint ¶ 65. The only apparent reason for including that detail is to connect the rugby team events alleged in the Complaint with Mann's tragic death.

principles. *See Dixon*, 504 F.3d at 84 (explaining that entity is permitted to defend itself against accusations of discrimination).

In sum, as with any denial of a discrimination claim, President Hurley's response to the OCR complaint might have cast doubt on the veracity of that complaint and those who filed it. The fact that a response to a discrimination complaint calls into question the credibility of the complainants, however, does not make the response a materially adverse retaliatory action. A person who charges an institution and its administrators with discrimination — particularly in a highly publicized way — should reasonably expect that the institution and its administrators may deny the claim in a publicized response. We are therefore satisfied that, to the extent the Complaint alleges retaliation based solely on President Hurley's letter of June 2015, the claim fails because the letter alone does not constitute a materially adverse retaliatory action. *See S.B. ex rel. A.L.*, 819 F.3d at 78 n.7 (determining that certain alleged retaliatory actions were not materially adverse as matter of law).

c.

In these circumstances, we will vacate the dismissal of the retaliation claim insofar as it is premised on UMW's deliberate indifference to student-on-student retaliatory harassment. We will affirm, however, the dismissal of the aspect of the retaliation claim that relies exclusively on President Hurley's June 2015 letter. We do not decide the probative value of Hurley's letter to the deliberate indifference part of the retaliation claim. We leave that issue for the remand proceedings.

41

C.

Finally, we turn to the equal protection claim pursued against President Hurley in his individual capacity under 42 U.S.C. § 1983, for his own deliberate indifference to student-on-student sexual harassment suffered by the plaintiff Feminists United members. In dismissing the equal protection claim, the district court rejected the premise of the plaintiffs' sexual harassment theory, i.e., that deliberate indifference to student-on-student harassment contravenes the Equal Protection Clause. The court further ruled that — because "UMW did not act with deliberate indifference in response to the plaintiffs' complaints" — the sexual harassment theory fails on the merits alongside the Title IX sex discrimination claim. *See Feminist Majority Found.*, 283 F. Supp. 3d at 502 n.15. Alternatively, the court ruled that Hurley is entitled to qualified immunity against the equal protection claim on the ground that "the constitutional right that Hurley allegedly violated was not clearly established." *Id.* at 502.[14]

On appeal, the plaintiffs challenge the district court's award of qualified immunity to President Hurley and its related dismissal of the equal protection claim, contending that Hurley's deliberate indifference to student-on-student sexual harassment violated a clearly established constitutional right. We begin our discussion of the equal protection claim by describing the qualified immunity standard. We then address whether that claim

---

[14] In addition to the sexual harassment theory of the equal protection claim, the district court considered and dismissed a disparate treatment theory. *See Feminist Majority Found.*, 283 F. Supp. 3d at 502; *see also King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016) (explaining disparate treatment equal protection claim). The plaintiffs do not pursue the disparate treatment theory on appeal.

exists and whether the plaintiffs have sufficiently alleged it against Hurley. Lastly, we consider whether the constitutional right that Hurley allegedly contravened was clearly established at the time of his challenged conduct.

1.

We have explained that "[q]ualified immunity shields government officials performing discretionary functions" from personal liability for damages under § 1983, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). Government officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted).

We retain discretion to address the separate qualified immunity inquiries in the order of our choosing. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *see also Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (relying, in part, on constitutional avoidance doctrine in concluding that court has discretion to first address clearly established prong (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))). We acknowledge, however, that "it is often the better approach to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). Indeed, the Supreme Court has explained "that

following the two-step sequence — defining constitutional rights and only then conferring immunity — is sometimes beneficial to clarify the legal standards governing public officials." *Camreta v. Greene*, 563 U.S. 692, 707 (2011). Thus, we first assess and decide whether there can be a constitutional claim for deliberate indifference to student-on-student sexual harassment and whether the plaintiffs have sufficiently pleaded such a claim.[15]

2.

a.

(1)

The plaintiffs primarily rely on two decisions — one from the Supreme Court and one from our Court — in contending that President Hurley contravened their equal protection rights. First, the plaintiffs point to *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009). In *Fitzgerald*, the plaintiffs alleged both a Title IX sex

---

[15] Our distinguished colleague also disagrees with our decision to reach the constitutional violation prong of the qualified immunity inquiry. *See post* at 86-88. Contrary to the Supreme Court's *Camreta* decision, the dissent would prefer to "leave [the] standards of official conduct [in these circumstances] permanently in limbo." *See* 563 U.S. at 706; *see also Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (explaining that constitutional violation inquiry prevents perpetual uncertainty regarding standards for official conduct). For support, our friend relies on the Court's *Pearson* decision, but fails to consider the factors specified therein that inform when it is appropriate to first address and resolve the constitutional issue. *See* 555 U.S. at 236-42. Put simply, however, the relevant *Pearson* factors are satisfied in this appeal. Indeed, the constitutional question has been fully briefed, *see id.* at 239, and the inquiry is not "so factbound that the decision provides little guidance for future cases," *see id.* at 237. Finally, we are not aware of any case in which the Supreme Court has granted certiorari on the question presented here. *See id.* at 238.

discrimination claim and a § 1983 equal protection claim based on student-on-student sexual harassment. The First Circuit had dismissed the *Fitzgerald* plaintiffs' equal protection claim on the premise that "Title IX [i]s the sole means of vindicating the constitutional right to be free from [sex] discrimination perpetrated by educational institutions." *Id.* at 251.

The Supreme Court reversed the court of appeals and determined that a victim of sex discrimination by a government official at an educational institution can pursue a § 1983 equal protection claim. The Court reasoned that the reach of Title IX and the Equal Protection Clause differ, observing that Title IX allows for lawsuits against only educational institutions and programs, but "§ 1983 equal protection claims may be brought against individuals as well as municipalities and certain other state entities." *Fitzgerald*, 555 U.S. at 257. The *Fitzgerald* Court also recognized that "the standards for establishing liability" under Title IX and § 1983 are similar but not "wholly congruent." *Id.* The Court elaborated that a "Title IX plaintiff can establish . . . liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference"; in contrast, "[a] plaintiff stating a similar claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice." *Id.* at 257-58. In light of those distinctions, the Court held "that § 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional [sex] discrimination in schools." *Id.* at 258.

The *Fitzgerald* Court did not address, however, whether a victim of student-on-student sexual harassment can pursue an equal protection claim against a school administrator based on his deliberate indifference to such harassment. *See* 555 U.S. at 259-60. The Court had no occasion to decide that question because the *Fitzgerald* plaintiffs disclaimed any deliberate indifference theory of their equal protection claim in the Supreme Court. They instead argued the claim based on the sexually discriminatory manner in which school administrators investigated and responded to complaints of harassment. Because the inferior courts had not addressed the merits of the equal protection claim, the Supreme Court remanded.

The second decision on which the plaintiffs rely for their equal protection claim is our 2007 en banc *Jennings* decision. There, prior to the Supreme Court's *Fitzgerald* decision, we recognized that the Equal Protection Clause secures a university student's "right to be free from sexual harassment in an educational setting." *Jennings*, 482 F.3d at 701. Under *Jennings*, that right encompassed an equal protection claim against a university administrator predicated on a theory of supervisory liability.[16]

The plaintiff in *Jennings* produced evidence that the university administrator had the "authority to take action against" a school coach who sexually harassed some of his players, but the administrator failed to do so and thereby allowed the harassment to

---

[16] In a context somewhat like that in *Jennings*, we have explained that "the equal protection clause confers on a public employee a federal constitutional right to be free from gender discrimination," including sexual harassment. *See Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

continue. *See* 482 F.3d at 701. In vacating the summary judgment award to the administrator, we explained that — on the plaintiff's evidence — a jury could find that the administrator "had actual knowledge of [the coach's] misconduct; that [the administrator's] response was so inadequate as to show deliberate indifference to or tacit authorization of [that misconduct]; and that there exists an affirmative causal link between [the administrator's] inaction and [the plaintiff's] constitutional injury." *Id.* at 701-02 (internal quotation marks omitted). We therefore ruled that the district court had erroneously awarded summary judgment on the equal protection claim.

(2)

Although the plaintiffs do not rely on any decisions from other circuits, we are aware that several of our sister courts of appeals have ruled — consistent with *Jennings* — "that sexual harassment in an educational setting can violate the [Equal Protection Clause], and that an administrator's ratification of that conduct could also violate [that] Clause." *See T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010); *see also, e.g.*, *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 851-52 (6th Cir. 2016). Because the issue was not presented therein, our *Jennings* decision did not decide whether a victim of student-on-student sexual harassment may pursue a constitutional claim against a school administrator who is deliberately indifferent to such harassment. But five other courts of appeals have concluded that a school official can be liable under the Equal Protection Clause for his deliberate indifference to student-on-student sexual harassment. *See Stiles ex rel. D.S.*, 819 F.3d at 851-52 (6th Cir.); *Hill v. Cundiff*, 797 F.3d 948, 978-79 (11th Cir. 2015); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135-38 (9th Cir.

47

2003); *Murrell*, 186 F.3d at 1250 (10th Cir.); *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir 1996).[17]

(3)

Our review of the foregoing authorities leads us to conclude that a victim of student-on-student sexual harassment can pursue an equal protection claim predicated on a school administrator's deliberate indifference to such harassment. This ruling is consistent with and compelled by the Supreme Court's *Fitzgerald* decision and the principles we enunciated in *Jennings*. As our distinguished departed colleague Judge Michael carefully explained in *Jennings*, the Equal Protection Clause of the Fourteenth Amendment secures a student's "right to be free from sexual harassment in an educational setting." *See* 482 F.3d at 701. Pursuant to *Jennings*, that Clause not only guards against sexual harassment perpetrated by a school administrator against students, it also protects students from a school administrator's deliberate indifference that allows such harassment to occur and persist. *See id.* at 701-02 (sustaining causal link that supports liability arising from, inter alia, administrator's deliberate indifference).

Although the equal protection claim in *Jennings* was premised on supervisory liability, there are compelling parallels between that claim and an equal protection claim premised on a school administrator's deliberate indifference to known student-on-student

---

[17] In addition to the five courts of appeals referenced above, the Second Circuit has ruled — with respect to student-on-student *racial* harassment — that a school official can be liable under the Equal Protection Clause for his deliberate indifference. *See DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012).

48

sexual harassment. In each circumstance, the school administrator has the power and opportunity to both address and rectify the sexual harassment. And, in each situation, the administrator's failure to exercise that power can result in the harassment victim suffering further injury. Lastly, each scenario directly impacts a student's right to be free from sexual harassment in an educational setting.

We are not alone in appreciating those parallels. When confronting a school administrator's deliberate indifference to student-on-student sexual harassment, our sister circuits have relied on the principle that a government official can be liable for a subordinate's sexually harassing behavior. *See Hill*, 797 F.3d at 978; *Murrell*, 186 F.3d at 1251. We are persuaded by the logic of those and other decisions that recognize an equal protection claim predicated on a school administrator's deliberate indifference to student-on-student sexual harassment. *See Stiles ex rel. D.S.*, 819 F.3d at 851-52; *Hill*, 797 F.3d at 978-79; *Flores*, 324 F.3d at 1135-38; *Murrell*, 186 F.3d at 1250; *Nabozny*, 92 F.3d at 454.

b.

To state an equal protection claim for deliberate indifference to known student-on-student sexual harassment, a plaintiff must first allege that she "was subjected to discriminatory peer harassment." *Stiles ex rel. D.S.*, 819 F.3d at 852. Secondly, the plaintiff must allege that the school administrator "responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of known circumstances." *Id.*; *see also Flores*, 324 F.3d at 1135 (same). In other words, the plaintiff must allege that the school administrator knew about harassment of the

49

plaintiff "and acquiesced in that conduct by refusing to reasonably respond to it." *Murrell*, 186 F.3d at 1250; *see also Hill*, 797 F.3d at 978 (same). Third, the plaintiff must allege that the school administrator's deliberate indifference was motivated by a discriminatory intent. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) (explaining that, to allege equal protection claim based on supervisory liability, plaintiff must plausibly demonstrate supervisor's discriminatory purpose); *Grindle*, 599 F.3d at 588 ("Because there is no theory of respondeat superior for constitutional torts, a plaintiff must plead that each . . . defendant has violated the Constitution. In the equal protection context, this means showing that the supervisor . . . intended to discriminate on the basis of a protected class." (citation and internal quotation marks omitted)).

Applying the foregoing legal principles to this situation, we are satisfied that — largely for the reasons set forth in our discussion of the Title IX sex discrimination claim — the plaintiffs have sufficiently alleged an equal protection claim against President Hurley. *See Hill*, 797 F.3d at 979 (referring to Title IX analysis in discussing equal protection claim); *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005) (recognizing "substantial[]" similarity between standards for deliberate indifference claims under Title IX and § 1983). In sum, the Complaint alleges that UMW students harassed and threatened the plaintiffs based on their sex. The Complaint further alleges that Hurley responded to that harassment with deliberate indifference, in that he had the authority to address and curtail the harassment but failed to do so over a period of months. *See Jennings*, 482 F.3d at 701-02 (explaining that district court erred in awarding summary judgment to university administrator who

50

ignored students' complaints of subordinate's sexually harassing behavior, thereby allowing subordinate to engage in further sexual harassment of students); *see also, e.g.*, *Flores*, 324 F.3d at 1135-36 (concluding that plaintiffs sufficiently alleged equal protection claim against individual school employees who failed to locate or discipline student harassers).

Additionally, with respect to President Hurley's discriminatory intent, the Complaint alleges that he "ratified the 'right' of angry students to target female classmates with hateful, sexist, threatening harassment, free from any disciplinary consequences." *See* Complaint ¶ 93. Indeed, according to the Complaint, Hurley sought to downplay the harassment and threats, and he made no effort to stop them. Those allegations are sufficient to state the intent element of the equal protection claim. *See* *Grindle*, 599 F.3d at 589 (concluding that jury could infer intent to discriminate from principal's failure to attempt to stop harassment and by her downplaying harassment).

With the constitutional violation sufficiently alleged, we must turn to the other qualified immunity prong. That is, we analyze and decide whether the right to be free from a university administrator's deliberate indifference toward known student-on-student sexual harassment was clearly established at the time of President Hurley's conduct.

### 3.

### a.

In assessing a claim of qualified immunity — which President Hurley has interposed here — the Supreme Court has explained that "[a] clearly established right is

51

one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). To be clearly established, a legal principle "must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589-90 (citations and internal quotation marks omitted).

Additionally, a clearly established legal principle is one that "clearly prohibit[s] the [official's] conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted). Nevertheless, a court need not have "previously found the specific conduct at issue to have violated an individual's rights." *E.W. ex rel. T.W.*, 884 F.3d at 185. Indeed, a right may be clearly established if a previously identified general constitutional rule obviously applies to the disputed conduct. *Id.* Even under novel factual circumstances, a government official "'can still be on notice that [his] conduct violates established law . . .' so long as the law provided 'fair warning' that [his] conduct was unconstitutional." *See Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

When performing the clearly established assessment, we first analyze "cases of controlling authority in this jurisdiction — that is, decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Booker*, 855 F.3d at 538 (internal quotation marks omitted). If there is no controlling authority, "we may look to a consensus of cases of persuasive authority from *other jurisdictions*, if such exists." *Id.* at 538-39 (internal quotation marks omitted).

52

b.

Although we recognize today that an equal protection claim can be predicated on a university administrator's deliberate indifference to student-on-student sexual harassment, we are also satisfied that President Hurley did not have fair warning that his conduct in this case gave rise to such a claim. We reach this conclusion because neither controlling authority nor a robust consensus of persuasive authority clearly established the pertinent right at the time of the wrongful conduct alleged in the Complaint.

(1)

We first observe that — when President Hurley failed to adequately respond to the harassment and threats lodged against the plaintiff Feminists United members — controlling authority did not clearly establish the right to be free from a university administrator's deliberate indifference to student-on-student sexual harassment. As discussed heretofore, the Supreme Court recognized in its 2009 *Fitzgerald* decision that a victim of student-on-student sexual harassment can pursue an equal protection claim against an individual school employee under § 1983. *See* 555 U.S. at 257-58. The *Fitzgerald* Court, however, did not define the applicable standard for an equal protection claim premised on deliberate indifference, in that the only theory presented to the Court concerned disparate treatment. Consequently, *Fitzgerald* did not itself provide fair warning that Hurley's response to student-on-student harassment was unconstitutional.

As for the plaintiffs' reliance on our 2007 *Jennings* decision, although we observed therein that a university administrator can be liable under § 1983 for his deliberate indifference to sexual harassment, *Jennings* did not involve student-on-student

53

harassment. *See* 482 F.3d at 701-02. Our discussion of deliberate indifference to sexual harassment in *Jennings* occurred solely in the context of a supervisory liability equal protection claim. As explained above, an equal protection claim predicated on a university administrator's deliberate indifference to school-official-on-student sexual harassment parallels an equal protection claim based on a university administrator's deliberate indifference to student-on-student sexual harassment. But the similarities between those two types of claims did not provide fair warning, i.e., "obvious clarity," that an insufficient response to student-on-student harassment violates established law. *See E.W. ex rel. T.W.*, 884 F.3d at 185. A reasonable administrator could well have perceived that a constitutionally impermissible response to harassment by a subordinate employee differed from a constitutionally impermissible response to harassment by a student. *See Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011) (en banc) (delineating that the relevant inquiry for qualified immunity is "whether it would be clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted" (internal quotation marks omitted)).

Moreover, although the *Jennings* decision recognized a general right to be free from sexual harassment at an educational institution, we must heed the Supreme Court's admonition not to define clearly established law too broadly. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." (internal quotation marks omitted)). Consequently, despite the fact that *Jennings* compels us to recognize the equal protection

54

right alleged in the Complaint, that decision failed to give President Hurley fair warning of his potential liability for violating that right.

(2)

Having examined controlling authority without discerning a clearly established right at the time of the events alleged in the Complaint, we will also consider the pertinent decisions of our sister circuits. Such persuasive authority clearly establishes a legal principle only when there was a robust consensus of decisions by the time of the allegedly wrongful actions. *See Wesby*, 138 S. Ct. at 589-90. Our recent *Booker* decision, of April 2017, sheds considerable light on what constitutes a robust consensus. *See* 855 F.3d at 543-45. In *Booker*, Chief Judge Gregory acknowledged that binding precedent did not clearly establish an inmate's First Amendment right to be free from retaliation for filing a grievance. Accordingly, *Booker* then reviewed persuasive authority available from the other circuits. Invoking decisions of ten of the thirteen courts of appeals, *Booker* observed that "[t]he unanimity among our sister circuits demonstrates that the constitutional question is 'beyond debate.'" *Id.* at 544-45. Based on that "overwhelming consensus," *Booker* determined that the constitutional right at issue was clearly established. *Id.* at 545.

In contrast with *Booker*, by the time of President Hurley's challenged conduct, only three circuits — the Seventh, Ninth, and Tenth — had rendered decisions of persuasive authority recognizing the general right of a student to be free from a school administrator's deliberate indifference to student-on-student sexual harassment. *See Flores*, 324 F.3d at 1135-38 (9th Cir.); *Murrell*, 186 F.3d at 1250 (10th Cir.); *Nabozny*,

55

92 F.3d at 454 (7th Cir.). And those courts of appeals adopted and applied different intent standards for such a claim. More specifically, the Ninth and Tenth Circuits authorized a student-on-student sexual harassment victim to proceed on the basis of an administrator's deliberate indifference alone, *see Flores*, 324 F.3d at 1135; *Murrell*, 186 F.3d at 1250, whereas the Seventh Circuit required that such a victim also prove the administrator's "discriminatory purpose," *see Nabozny*, 92 F.3d at 454; *see also Grindle*, 599 F.3d at 588. Because of the limited number of relevant decisions that could be persuasive authority, plus their apparent lack of accord on the intent element, we are not convinced that there was a robust consensus of decisions providing Hurley with fair warning that his challenged behavior was unlawful. *See McClendon v. City of Columbia*, 305 F.3d 314, 331 (5th Cir. 2002) (concluding that, although three other circuits recognized constitutional right, their differing "mental state" requirements did not fairly warn government official of what conduct would contravene that right). We are therefore satisfied that the persuasive authority did not — at the appropriate time — clearly establish the constitutional right at issue in these proceedings.[18]

---

[18] It bears mentioning that, by the time of President Hurley's challenged conduct, the Sixth Circuit had acknowledged — by way of a nonbinding unpublished opinion — the constitutional right to be free from a school administrator's deliberate indifference to student-on-student sexual harassment. *See Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 356-57 (6th Cir. 2014) (No. 13-3423). We have ruled, however, that unpublished opinions "cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity." *See Booker*, 855 F.3d at 543 (quoting *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc)).

We are thus constrained to conclude that, at the time of President Hurley's challenged conduct, the equal protection right to be free from a university administrator's deliberate indifference to student-on-student sexual harassment was not clearly established by either controlling authority or by a robust consensus of persuasive authority. Consequently, Hurley is entitled to qualified immunity, and the dismissal of the equal protection claim by the district court must be affirmed.

IV.

Pursuant to the foregoing, we affirm the dismissal of the § 1983 equal protection claim against President Hurley and that part of the Title IX retaliation claim against UMW predicated solely on Hurley's June 2015 letter. We vacate, however, the dismissal of the Title IX sex discrimination claim against UMW and the balance of the retaliation claim. We remand for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART, AND REMANDED*

AGEE, Circuit Judge, dissenting in part and concurring in part:

The Information Age revolutionized how people communicate. With the click of a mouse, individuals can communicate across the globe, participate in virtual classrooms, and harass strangers and peers alike under a cloak of anonymity. These rapid changes brought by online technology have not caused Congress to amend Title IX to change the circumstances in which federal education funding recipients can be held liable for online harassment affecting the recipients' students. Consequently, plaintiffs pursuing such a claim are subject to the same strict requirements the Supreme Court set out in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), two decades ago. *Davis* held that Title IX narrowly limits a funding recipient's potential liability only to those situations where the recipient exercises substantial control over both the harassers and the context of the harassment. *Id.* at 645.

In 2014 and 2015, unknown individuals in the vicinity of the University of Mary Washington campus posted hundreds of crude and sometimes vulgar messages on a social media app criticizing "feminists" (and various unflattering derivatives), and in particular members of the Feminists United on Campus, an affiliate organization of the Feminist Majority Foundation. This anonymous online harassment spurred the Appellants' (collectively "FMF") suit against the University of Mary Washington ("the University") and its former president, Richard Hurley. FMF's Complaint alleges that the University and Hurley are liable under Title IX and 42 U.S.C. § 1983 for failing to do more "to eliminate this sexually hostile environment, prevent its recurrence, and address its effects." J.A. 11, ¶ 1.

58

The majority opinion agrees and would hold a public university and its officers liable for an allegedly inadequate response to anonymous messages posted by unknown persons on a third-party social media app unrelated to the university. The district court dismissed all of the claims and that judgment should be affirmed in whole. In particular, I disagree with the majority's conclusion that the FMF's Title IX claims—which are based on deliberate indifference to peer harassment—adequately alleged that the University exercised substantial control over the harassers and the context of the harassment, so as to show either a sex discrimination or a retaliation claim. However, I concur with the majority's decision to affirm the district court's dismissal of FMF's Title IX claim alleging the University retaliated by disseminating a letter responding to FMF's administrative complaint. Further, while I concur with the majority's decision to affirm the district court's dismissal of FMF's § 1983 equal protection claim against President Hurley, the qualified immunity analysis is unnecessarily overbroad. The only holding necessary, and prudent under the circumstances, is that qualified immunity is appropriate because FMF's claim is not based on a clearly established violation of protected rights.

## I.    Title IX: Deliberate Indifference to Peer Discrimination

The majority opinion contorts the cause of action recognized in *Davis,* 526 U.S. 629, beyond recognition. In *Davis*, the Supreme Court held that a recipient of federal education funds may be liable under Title IX for peer harassment that occurs in a context controlled by the funding recipient only when its response to actual notice of that harassment is clearly unreasonable. *Id.* at 648. But the majority's unprecedented view of

a Title IX *Davis* claim exposes a funding recipient to liability even when the allegations show that neither the student victims nor their school knows who the harassers are, much less has control over them, and the school has no control over the environment in which the harassment occurred. Because a faithful application of *Davis* requires affirming the district court's dismissal of the Complaint's Title IX sex discrimination claim, I respectfully dissent.

A.

With certain exceptions not applicable here, Title IX prohibits recipients of federal education funds from discriminating on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"). Unlawful discrimination "on the basis of sex" can include sexual harassment. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). Although Title IX does not expressly authorize a private right of action to enforce its prohibitions, the Supreme Court has recognized an implied private right of action exists under the statute. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

The Supreme Court described such a private right of action in *Davis*, holding that Title IX allows an implied private cause of action for money damages "where [a] funding recipient acts with deliberate indifference to known acts of [student-on-student, or peer,] harassment in its programs or activities." 526 U.S. at 633. In examining when such a claim may proceed, however, the Supreme Court articulated certain threshold

60

requirements that are essential conditions precedent to a Title IX *Davis* claim before the

claimant's burden of showing deliberate indifference arises. *Id.* at 647–49.[1]

Of particular importance here, the Court repeatedly noted the "limited

circumstances" in which such a claim may be brought, *id.* at 643, cautioning that funding

recipients can be held liable only for their own misconduct, *id.* at 640—that is, where

recipients decide "to remain idle in the face of known student-on-student harassment in

[their] schools," *id.* at 641. The Court explained that

> both the deliberate indifference standard and the language of Title IX
> narrowly circumscribe the set of parties whose known acts of sexual
> harassment can trigger some duty to respond on the part of the funding
> recipients. Deliberate indifference makes sense as a theory of direct liability
> under Title IX *only where the funding recipient has some control over the
> alleged harassment. A recipient cannot be directly liable for its indifference
> where it lacks the authority to take remedial action.*

*Id.* at 644 (emphasis added).[2] In sum, a funding recipient's liability must exercise

"*substantial* control over *both*" the harasser ("the harasser inquiry") and "the

environment in which the harassment occurs" ("the context inquiry") before the recipient

can be held liable under Title IX. *Id.* at 645 (emphasis added). If these threshold

---

[1] The University did not challenge several aspects of a Title IX deliberate indifference claim as part of its motion to dismiss. It does not dispute, for example, that it is a recipient of federal funding or that it had actual notice of the alleged peer harassment. Moreover, it does not contest for present purposes that the harassment occurred "on the basis of sex" or that it was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Because the University did not press these points as a basis for dismissing the claim under Rule 12(b)(6), I do not address them either.

[2] I have omitted all internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

requirements are not met, a funding recipient cannot "be said to expose its students to harassment or cause them to undergo it under the recipient's programs" so as to violate Title IX. *Id.* at 645. If a claimant fails to plead facts that would be sufficient to prove these conditions precedent, then the complaint must fail as a matter of law. *See In re Total Realty Mgmt., LLC*, 706 F.3d 245, 250, 255 (4th Cir. 2013) (explaining the Federal Rule of Civil Procedure 12(b)(6) standard).

In short, as the Court has previously explained, "*Davis* sets the bar high for deliberate indifference. . . . [A] school may not be held liable under Title IX . . . for what its students do, but only for what is effectively an official decision by the school" to act in a "clearly unreasonable [manner] in light of the known circumstances." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 76 (4th Cir. 2016).

### B.

The district court dismissed FMF's deliberate indifference claim under Rule 12(b)(6) for failure to state a claim. To survive a motion to dismiss, the Complaint had to "plead[] factual content that allows . . . the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And in reviewing de novo whether the Complaint adequately alleges a claim, a court must "accept as true all of the factual allegations contained in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014).

Under the familiar pleading standards, a complaint must contain "[f]actual allegations [sufficient] to raise a right to relief above the speculative level." *Bell Atl.*

62

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[N]aked assertion[s] devoid of further factual enhancement" do not suffice. *Iqbal*, 556 U.S. at 678. Instead, the complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*

Bound by this settled standard to compare the allegations in the Complaint to *Davis* and subsequent cases, the district court correctly dismissed FMF's claim. With respect to the threshold requirements for a Title IX *Davis* claim, the Complaint does not allege that the University exercised substantial control over either the harassers or the context of the harassment. Indeed, a failure to satisfy either the harasser inquiry or the context inquiry is sufficient to dismiss the claim. As the Complaint fails both inquiries, the district court's decision is irrefutable.

1.

The harasser inquiry is an essential prerequisite to establishing liability because both the deliberate indifference standard and Title IX's plain language "narrowly circumscribe the set of parties whose known acts of sexual harassment can trigger some duty to respond on the part of the funding recipients." *Davis*, 526 U.S. at 644; *see also Doe-2 v. McLean Cty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 512 (7th Cir. 2010) ("The [harasser inquiry] is essential for Title IX liability because [an educational institution] cannot be liable for its indifference to harassment that it lacks the authority to prevent."). Liability thus hinges on "the harasser [being] under the school's disciplinary authority." *Davis*, 526 F.3d at 647. True peer harassment satisfies this requirement when a student attending the defendant school complains that another student attending that

63

school—who has either been individually identified or specifically associated with that school—has harassed her. For example, in *Davis*, this inquiry was satisfied because a parent alleged that her daughter's school board and related defendants had been deliberately indifferent to complaints that an identified classmate was sexually harassing her daughter. 526 U.S. at 633–34, 645.

Viewed in the light most favorable to FMF, the Complaint does not plausibly allege that the University exercised substantial control over the harassers. In sum, the harassing statements were anonymous and untethered to the University's geographic footprint, and thus could have been communicated by students and non-students alike so long as they were in the general vicinity of the campus. *See infra* n. 6.[3]

The Complaint does not identify the harassers or provide a factual basis for inferring whether they were students or nonstudents. And even if assumed to be a University student, the Complaint also fails to identify who—of the over 5,000 University students—they were. *See* Marty Morrison, *UMW Board of Visitors Announces Tuition Fees for 2014–15*, UMW Voice (May 9, 2014), https://www.umw.edu/news/2014/05/09/umw-board-of-visitors-announces-tuition-fees-

---

[3] In reaching its decision, the district court extended FMF the "reasonabl[e] inference that many of the [Y]aks came from students because of the location-based nature of Yik Yak." J.A. 57. In so doing, it made the same mistake the majority opinion does, transforming general allegations about vicinity into assumptions of unstated specificity. But neither supports finding that the funding recipient exercised substantial control over the harasser. Under the pleadings of this Complaint, any "inference" that the alleged harassers were University students is purely speculative and not reasonably found in the allegations.

for-2014-15 (saved as ECF Opinion Attachment). The Complaint alleges that "Yik Yak is an anonymous social media app," J.A. 16 ¶ 22, meaning that posts on the app, "Yaks," are anonymous: the authors are unnamed. The Complaint also repeatedly acknowledges that the identity of the harasser or harassers was unknown. *E.g.*, J.A. 31 ¶ 63 (recounting one individual plaintiff's fear was exacerbated because "she did not know if those who threatened and harassed [her] were sitting with [her] in class"); 35 ¶ 78 (describing that the "anonymous nature of the harassment intensified" the individual plaintiffs' "concerns, as they had no way of knowing which students harbored animosity against them"). Unlike the circumstances that occurred in *Davis*—and indeed most Title IX *Davis* cases—the harasser inquiry has not been satisfied here by alleging either the names of the harassers or facts to support their affiliation with the funding recipient. *E.g.*, *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1056 (8th Cir. 2017) (identifying college fraternity member); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1288–90 (11th Cir. 2007) (involving named student); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1243–44 (10th Cir. 1999) (same). By contrast, although the Complaint claims that "[s]tudents posted Yaks," J.A. 16 ¶ 22, it contains no factual basis for drawing that conclusion. *See Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (reiterating that although courts must "draw[] all reasonable factual inferences from [a complaint's] facts in the plaintiff's favor, . . . it need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments" ).

Nor does the Complaint plausibly allege facts that otherwise narrow the universe of potential anonymous harassers to the University's student body. To the contrary, the

Complaint's allegations about Yik Yak's geographic limits open the universe of possible harassers to the general population who are not students. Based on the Complaint's allegations of how Yik Yak operated, Yaks visible to University students on the app could have been sent by anyone who was within a 1.5-mile radius (3-mile diameter) of the viewer. J.A. 16 ¶ 22 ("Yik Yak . . . allows people to create and view messages . . . within a 1.5 mile radius."). The majority accepts FMF's invitation to draw the inference that since the geographic range includes the University's campus and the topic of the Yaks concerned University matters and University students, the senders were University students. In so doing, the majority goes beyond permissible inference to pure speculation to reach a desired result.

Each Yak could have been sent by *any* Yik Yak user located within Yik Yak's geographic range. And that range, even from the center of campus, extends well beyond the University's roughly 0.3-square-mile territory in every direction. *Compare [a place to] Distinguish Yourself*, Univ. of Mary Washington 3, https://documents.umw.edu/document/umw-a-place-to-distinguish-yourself/ (last visited Dec. 4, 2018 and saved as ECF Opinion Attachment) (stating the campus contains "176 acres of stately buildings and beautiful woodlands"), *with University of Mary Washington*, U.S. News & World Report, https://www.usnews.com/best-colleges/mary-washington-3746 (last visited Dec. 4, 2018 and saved as ECF Opinion Attachment)

66

(listing the campus size as 234 acres).[4] Given that there are no allegations about where the students were on campus, the geographic range of possible posters extends far off campus.

The University's campus is located in the city of Fredericksburg. Within the 1.5-mile Yik Yak coverage radius surrounding the campus are populated areas, including residential neighborhoods, apartment complexes, and numerous shopping and dining establishments. In addition, Yaks posted by individuals located at Mary Washington Hospital, James Monroe High School, the Central Rappahannock Regional Library, as well as downtown Fredericksburg state and municipal buildings would all be within Yik Yak's geographic range on the University's campus. Yik Yak's limited geographic range thus cannot serve as a basis for inferring that the anonymous harassers were University students.[5]

---

[4] Geographical information such as distance and size are "especially appropriate for judicial notice." *United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984).

[5] To determine the general location of the University's campus in Fredericksburg, I have relied on Google maps (maps.google.com) and its "Distance Measurement Tool." I have also cabined the points described above to locations safely within Yik Yak's range. The relative location of the University and the cited off-campus buildings is undisputed and properly subject to judicial notice. *See* Fed. R. Evid. 201(b); *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (collecting cases supporting taking judicial notice of content gleaned from Google maps and its features given that geographic facts and distances are "peculiarly susceptible to judicial notice"); *see also Livingston Christian Schs. v. Genoa Charter Twshp.*, 858 F.3d 996, 1008 (6th Cir. 2017) (taking judicial notice of Google "maps showing the distances between" cities and properties); *McCormack v. Hiedeman*, 694 F.3d 1004, 1008 n.1 (9th Cir. 2012) (same).

Coupled with the overbreadth of Yik Yak's geographic limitation is the equally problematic fact that it only reflects where the person was at the moment the Yak was sent. Thus, each of the hundreds of Yaks FMF complained of could have been sent by an ever-shifting and fluid number of senders based on who was in that range, much of which was *not* part of the University campus. The potential body of harassers is characterized by a persistent transience that makes it even more difficult to know with any level of confidence who sent each Yak, much less that they were a student. *And, of course, even if a student, their identity was still unknown.*

These deficits in the Complaint's factual allegations are fatal to FMF's deliberate indifference claim. Merely labeling something as student harassment does not make it so. And because no facts support the conclusion that the University exercised substantial control over the harassers, the Complaint fails on its face to plausibly show that FMF would be entitled to the relief requested. *See Iqbal*, 556 U.S. at 678 (explaining that "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief"); *McCleary-Evans v. Md. Dep't of Transp., State Hwy. Admin.*, 780 F.3d 582, 587 (4th Cir. 2015) (noting that in *Twombly* and *Iqbal*, the Supreme Court "reject[ed] a standard that would allow a complaint to survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery").

The majority fails to meaningfully grapple with *Davis*' harasser inquiry and how "the language of Title IX narrowly circumscribe[s] the set of parties whose known acts of

68

sexual harassment can trigger some duty to respond on the part of the funding recipients." 526 U.S. at 644. The fleeting one-page discussion of the harasser inquiry by the majority simply presupposes that the harassers were students. *See* Maj. Op. 21. To the extent that it purports to engage in analysis, the majority opinion embraces considerations that are not properly part of *Davis*' harasser inquiry. For example, the majority generally discusses whether the University can punish students for sexually harassing other students. The answer to that question is clear: it can. But that simplistic conclusion has nothing to do with analyzing the *pleadings in the Complaint* and ignores the correct *Davis* inquiry: does the University have control over the harassers?

To avoid that necessary inquiry, the majority misdirects the focus to the fact that the *targets* of the harassment were University students under the University's care. But that fact, of course, has nothing to do with the *Davis*-mandated inquiry that "the *harasser* [be] under the school's disciplinary authority." *See* 526 U.S. at 647 (emphasis added); *see also id.* at 646 (reiterating that liability exists only where the funding recipient "exercises significant control over *the harasser*" (emphasis added)). Whether the school has any authority over the victim is not the proper inquiry under *Davis*.

In sum, FMF fails to adequately allege the threshold requirement of control over the harasser. Because the Yaks were anonymous, they could have been posted by anyone within a geographic area that extended well beyond the University's campus. The Complaint contains only the "naked assertion," *Iqbal*, 556 U.S. at 678, that students posted them and that allegation is insufficient as a matter of law to plead a cognizable

69

Title IX claim. Consequently, the district court's dismissal of the deliberate indifference to discrimination claim should be affirmed on this basis alone.

2.

Even if FMF's Complaint had adequately alleged substantial control over the harassers, that would not end the threshold control inquiry necessary to hold a funding recipient liable. *Davis* separately requires that the funding recipient also exercise substantial control over the context of the harassment. 526 U.S. at 645. FMF's allegations do not plausibly claim that the University exercised such control over Yik Yak or the offensive Yaks. This deficiency independently supports the district court's dismissal of FMF's deliberate indifference claim.[6]

*Davis* explained that both the plain language of Title IX and the standard of deliberate indifference require proof that "the harassment [took] place in a context subject to the [funding recipient's] control." *Id.* at 645. The Supreme Court went on to elaborate that the context inquiry exists because Title IX only redresses harassment that occurs "under" "the operations of" federal education funding recipients. *Id.*

As a general principle, then, Title IX does not hold funding recipients liable for peer harassment that occurs outside of an environment subject to the recipients' substantial control. *E.g.*, *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1117–18, 1121 n.1 (10th Cir. 2008) (observing that the requisite level of control

---

[6] Although the Complaint also references other events that occurred on campus, FMF's claim as advanced in the district court and on appeal is based on the University's alleged indifference to requests to address harassment on Yik Yak. *See* Maj. Op. 18–20.

over the context did not exist where the harassment occurred off campus save for "an oblique and general reference to harassment or teasing on the school bus or in the halls at school"); *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) (concluding that the university was not liable under Title IX where assault occurred off campus). The substantial control principle necessarily means that Title IX does not hold schools liable for all peer harassment. The majority runs afoul of this basic premise by reasoning that the University controlled the harassment because it "concerned events occurring on campus and specifically targeted UMW students"—an empty standard that eviscerates *Davis*' context inquiry. *See* Maj. Op. 19. That context inquiry must require substantially more than just allegations that students are the victims of harassment or that school events provide a backdrop for the reported harassment. Otherwise, it would be meaningless and Title IX's plain language would be routinely ignored.

Because true peer harassment necessarily involves student harassers and student victims, the harassment will *always* implicate the funding recipient's operations to some degree. This fact alone does not engender liability. *See Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (rejecting the argument that a university's "disciplinary control over the rapist"—"because he was a student"—satisfied the *Davis* context inquiry, or that the inquiry was satisfied by "the nature of the relationship between the students and the institution" alone). Instead, the harassment must occur in an environment over which the funding recipient can reasonably exercise substantial control. *Davis*, 526 U.S. at 645 (stating that only when a funding recipient "exercises substantial control over . . . the

71

context in which the known harassment occurs . . . can the recipient be said to expose its students to harassment or cause them to undergo it under the recipient's programs'").

*Davis*' context requirement is most readily satisfied when the harassment occurs on a school's campus. That was the case in *Davis*: a student harassed another student "during school hours and on school grounds," and principally "in the classroom." *Id.* at 646. Drawing on *Davis*' directive, circuit courts have held that "[w]hen conduct occurs at a school in another district or off school grounds entirely, the [defendant school does not have control] over . . . the context." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 366 (6th Cir. 2012); *see also Roe*, 746 F.3d at 884 (holding that a university could not be held liable for a rape that occurred at an off-campus party because "there was no evidence that [it] had control over the student conduct" there); *Doe-2*, 593 F.3d at 512–13 (holding that a school lacked the requisite control over the "context" of a former teacher's harassment of the plaintiff because it occurred in a different school district, at a school "where the defendants had no supervisory authority").

This is not to say that a school never has substantial control over the context of harassment when the underlying events occur off campus. *See Rost*, 511 F.3d at 1121 n.1 ("We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX. *Davis* suggests that there must be some nexus between the out-of-school conduct and the school."). But there must be some additional proof that the school exercised dominion over the environment in which the alleged harassment occurred. For example, relying on *Davis*, a funding recipient may be found to have exercised substantial control when the underlying harassment occurred on other property

72

controlled by the defendant, such as a school bus, or during a school-supervised activity off campus. *E.g., Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 668 (2d Cir. 2012) (applying the *Davis* standard to a Title VI claim and concluding the requisite level of control existed over the context where the underlying conduct "occurred on [school] grounds or its property (such as the buses to [an off-campus vocational program run by the school])"); *see also Davis*, 526 U.S. at 646 (citing favorably a Seventh Circuit case stating that a school could be held liable when the harassment took "place while the students are involved in school activities or otherwise under the supervision of school employees"); *Rost*, 511 F.3d at 1121 n.1 (discussing the requisite nexus between the context of the harassment and the school). In all events, the essential hook under *Davis* is that the school has "substantial control" over where the harassment occurred such that it has authority to take remedial action in that place. 526 U.S. at 644.

*Davis* did not provide an exhaustive list of characteristics that are relevant to the context inquiry. But the language the Supreme Court used to describe the inquiry— "environment," "where it [has] the authority to take remedial action," "under the operations of," and "during school hours and on school grounds"—demonstrates the strong connection necessary to the setting and timing of cognizable peer harassment.[7] *Id.* at 644, 645, 646.

---

[7] *Davis* references as part of the context inquiry that the harassment occurred "during school hours," 526 U.S. at 646, though the phrase is always connected to "on school grounds." The timing of the discriminatory conduct is more relevant to the structured environment of grade-school education because it further informs whether the funding recipient had control over the harassers. One can imagine a scenario where (Continued)

Applying these principles here, FMF's Complaint does not adequately allege that the University exercised substantial control over the context of the harassment. As an initial matter, looking to the physical location of the harassment is not a proper fit. In typical *Davis* cases, courts have used the funding recipient's school grounds or campus as a basis for determining whether the school exercised substantial control over that environment. But because FMF's claim arises from alleged harassment that occurred in the ether, on a social media app, the location of the harassment is several degrees removed from the traditional geographic consideration: the funding recipient's real property. Thus, at a basic level, the context of the harassment in this case is markedly different from prior *Davis* claims.[8] Online harassment will never, by its nature, occur on a

---

harassment occurs on high school property during the weekend or summer when the school is not open and students are on the grounds for their own reasons unrelated to school or any extracurricular event. In those circumstances, both the location *and* the timing of the harassment may be relevant to the context inquiry.

But the significance of the harassment's time of day is not as readily apparent in cases involving college and university students, whose classes occur throughout the day and in a less structured form, and who may be living on campus. The online nature of the harassment further strains its applicability to this case. So, although FMF does not allege timing in its Complaint, I also do not base my analysis on this sometimes-relevant factor.

[8] To date, no circuit court has held a funding recipient liable for deliberate indifference under Title IX based on online peer harassment, and only one circuit court has addressed allegations of this kind. In an unpublished opinion, the Sixth Circuit held that the plaintiff student failed to demonstrate that the school exercised substantial control over the context of harassment when high school "students posted hurtful comments on [the plaintiff's] Facebook page, with many others 'liking' the post." *Gordon v. Traverse City Area Public Schs.*, 686 F. App'x 315, 324 (6th Cir. 2017). The court observed that the plaintiff "offer[ed] no evidence that students 'liked' the offending Facebook posts during school hours, and he [failed] to explain how [the defendant school] retained control over its students' off campus internet use." *Id.*

school's grounds or other physical location controlled by a funding recipient in the same way that in-person harassment will. In short, the manner in which in-person harassment can be found to satisfy the context inquiry will necessarily differ from the way in which online harassment could be found to satisfy that inquiry. Even so, *Davis*' context inquiry must be satisfied before a funding recipient can be said to incur any liability.

The Complaint does not plausibly allege that the act of posting harassment occurred on the University's campus. The majority opinion grounds its de minimis context inquiry in its atextual conclusion that "due to Yik Yak's location-based feature, the harassing and threatening messages originated on or within the immediate vicinity of the UMW campus." Maj. Op. 19. This conclusion presents at least two factual problems: First, as discussed in the context of the harasser inquiry, there are no allegations in the Complaint that permit a non-speculative inference that the messages originated on campus. Although the Complaint alleges that Yik Yak allowed only individuals within a 1.5 mile radius to post messages to each other, no allegations further narrow that range to the University's campus. Second, being on or off campus matters to the inquiry because messages posted "in the vicinity of" the campus do not—without more—have a sufficient connection to satisfy *Davis*' context inquiry. Being near an environment that the University controls cannot demonstrate that the University controls the harassment's origination point. To the contrary, it leads to the conclusion that the University does *not* control the harassment environment. *Davis* simply does not permit the majority to deem "vicinity" to be close enough to state a claim.

75

For example, in *Ostrander*, a university student alleged that her school should be held liable for its deliberate indifference to her sexual assault by a fellow university student. 341 F.3d at 747. The assault occurred at an on-campus house that was owned by two private individuals who had leased the property to students who were fraternity members and their parents. *Id.* at 748. The Court held that the university could not be held liable under Title IX because "[t]he record [was] clear [that it] did not own, possess, or control the . . . premises" where the assault occurred and thus it did not occur "in a context subject to the [university's] control." *Id.* at 750. Over a decade later, the Eighth Circuit reiterated that *Davis* "made it clear . . . that to be liable for deliberate indifference under Title IX, a University must have had control over the situation in which the harassment or rape occurs." *Roe*, 746 F.3d at 884. In this later case, the plaintiff alleged a fellow university student raped her "during a private party in an off campus apartment" leased by three students, including two members of a university fraternity. *Id.* The Eighth Circuit rejected her argument that the university controlled the context of her assault as a result of controlling "its students and fraternities" and that "universities may control certain off campus behavior due to the nature of the relationship between students and the institution." *Id.*; *see also Samuelson v. Oregon State Univ.*, 725 F. App'x 598, 599 (9th Cir. 2018) (memorandum op.) (observing that the plaintiff's "sexual assault occurred off campus . . . at a location that had no sponsorship by or association with" the funding recipient, meaning that she "ha[d] failed to allege how [the funding recipient] exercised any control over the environment of her sexual assault").

That the alleged harassment occurred online is not necessarily dispositive, however, because *Davis'* physical location requirements may have virtual counterparts. For example, a funding recipient may own or otherwise have a property interest in the online forum where the harassment occurred or the means the harasser used to access that forum. But neither circumstance has been alleged here. Specifically, the Complaint does not allege that the University owned Yik Yak or otherwise exercised any control over its content or operation. From all that can be reasonably inferred from the Complaint, Yik Yak was a third-party social media app that was unrelated to the University and open to students and non-students alike. Hence, nothing in the Complaint allows the conclusion that the University had any authority to control what happened on Yik Yak.

Nor does the Complaint allege that the University exercised control over other aspects of the environment where the harassment occurred. The Complaint does not allege that the University ever directed its students to access or use Yik Yak for any school business or activities. Individuals accessed the forum on their own initiative totally unrelated to *any* University relationship or business. Put differently, this is not alleged to be a situation where the harassment occurred on a University-hosted social media account or as part of online coursework, circumstances where the alleged harassment could satisfy *Davis'* context inquiry. In addition, nothing in the Complaint supports the conclusion that the University facilitated access to the forum where the alleged harassment occurred. That is to say, the Complaint does not allege that the University owned or controlled the electronic devices on which the harassers accessed Yik Yak. Further, the Complaint does not allege facts demonstrating that any of the

harassing Yaks were posted using the University's wireless network. The Complaint simply offers no facts connecting the University to the forum in which the harassment occurred (Yik Yak) or alleging that a University-controlled means was used to access that forum (University computers or wireless network).

The absence of allegations concerning the wireless network merits a brief additional discussion because the majority opinion asserts otherwise, claiming that "some of the offending Yaks were posted using the University's wireless network, and the harassers necessarily created those Yaks on campus." Maj. Op. 19. This is baseless speculation without support in the Complaint. At no point does the Complaint allege any facts that connect any of the Yaks to the University's wireless network. *See* J.A. 6–27.

To be sure, the Complaint alleges the Yaks had to be created within the geographic parameters of the app because of how Yik Yak operated. But, as already discussed, that range extended well off campus into the Fredericksburg community at large. Furthermore, as the Complaint recognizes, students and nonstudents alike could access Yik Yak within those geographic parameters through non-University network capabilities on their own personal devices; they had no need to use the University's wireless network to do so. *See* J.A. 26, ¶ 50. In sum, the allegations fail to plausibly associate even one harassing Yak to the University's wireless network.

With one exception, all of the Complaint's references to the University wireless network occur in the context of discussing that students asked the University to ban Yik Yak from being accessible on the University network. *See* J.A. 26–27, 29–30, 39. Students' repeated requests to the University to ban Yik Yak obviously do not correlate

to whether anyone had ever used the University's wireless network to access Yik Yak in the first instance, let alone that anyone had done so to post a harassing Yak.[9] The one exception occurs in the Complaint's preliminary statement and introduction to the underlying events, which postulates that the "Defendants failed to report the threats of violence to law enforcement authorities or even to attempt to identify the assailants, *even though the University's wireless internet was used to access Yik Yak*, thereby facilitating the cyber assaults and threats, and the assailants' conduct violated Virginia law." J.A. 12, ¶ 5 (emphasis added). Such a conclusory characterization, utterly unsupported by any factual development or allegations in the statement of the underlying facts anywhere in the Complaint, does not satisfy FMF's minimal pleading burden under *Twombly* and *Iqbal*. *See, e.g.*, *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011). For these reasons, the Complaint does not contain allegations that allow for a connection between

---

[9] FMF's persistent requests to ban Yik Yak use for all students demonstrates their indifference to the need to balance their Title IX claims against the First Amendment rights of their peers. To stop speech FMF doesn't want to hear, it wishes to close the public forum to all speech and all speakers. Just as universities have a duty to fulfill their obligations under Title IX, they also have a duty not to trample on the First Amendment rights of their students. *See IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993) (stating that "the manner of [a public university's] action cannot consist of selective limitations upon speech"). And "a bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive of disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). This means that adults may both express and encounter speech that is "vehement, caustic, and sometimes unpleasant." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). And it also means that universities cannot "restrict expression because of its message or its ideas" such as by "silencing speech on the basis of its viewpoint." *IOTA XI*, 993 F.2d at 393. Blocking Yik Yak from the University's wireless network would have run afoul of these principles without any apparent effect given that—at least as alleged—nothing connected the University's wireless network to any of the reported Yaks in the first place.

the University's wireless network—over which the University does have control—and Yik Yak or the offensive Yaks—over which the University has no control.

The Complaint simply fails to plead a fundamental part of a *Davis* claim: that the University substantially controlled the context where the harassment occurred. When comparing the hallmarks of the context inquiry under *Davis* against the Complaint's allegations, the Complaint fails to plausibly allege facts sufficient to satisfy this threshold requirement. As such, the University cannot be held liable under Title IX.

Nothing in the majority opinion's scant analysis alters this conclusion. To the contrary, after mentioning that *Davis* requires a showing of substantial control over the context of the harassment, the majority ignores the principles set out by the Supreme Court. Added to the errors already discussed, a few more examples illustrate how far the majority's analysis strays from *Davis*' explanation of the context inquiry.

The majority opinion cites this Court's decision in *Kowalski v. Berkeley County School*, 652 F.3d 565, 573 (4th Cir. 2011), for the observation that "speech originating outside of the schoolhouse gate but directed at persons in school and received by and acted on by them [may] in fact [constitute] in-school speech." Maj. Op. 19. That observation, made in the context of a First Amendment challenge and school-disruption analysis under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), says nothing about the Title IX *Davis* context inquiry. While both *Tinker* and *Davis* direct courts to look to certain aspects of the school environment, the underlying

80

principles, objectives, and analyses in each case are markedly different.[10] What is more, the record in *Kowalski* showed that although Kowalski created the website off campus, other students used both school and personal computers to access and comment on it. 652 F.3d at 567–68, 574. No similar allegations establishing the necessary nexus concerning on-campus conduct exist here.

The majority opinion also conjures up that the University controlled the context of the harassment because it could have "control[led] activities that occur on its own [wireless] network" such as by blocking any person on the University's network from accessing Yik Yak or banning the harassers (once identified) from using the University's network for any purpose. Maj. Op. 20. Such analytical sleight of hand substitutes obvious areas over which the University could have exercised control (its wireless network and

---

[10] *Kowalski* is a First Amendment case brought by a student who alleged a school district violated her free speech rights when it suspended her for "creating and posting to a MySpace.com webpage" that "was largely dedicated to ridiculing a fellow student." 652 F.3d at 567. Analyzing that issue required the Court to apply the principles set out in *Tinker* about whether student speech created a sufficient classroom disruption to warrant school discipline. Consistent with a long line of circuit court precedent applying *Tinker*, the Court held that although Kowalski created the website off-campus outside of school hours, her "speech caused the interference and disruption described in *Tinker* as being immune from First Amendment protection." 652 F.3d at 572.

While *Tinker* directs courts to consider disruption of the school's educational objectives, classroom management, and the rights of other students as part of its analysis, *Davis* contains no corollary discussion. The Supreme Court could have drawn on *Tinker* and related students' rights cases in crafting the context inquiry under Title IX, but it did not do so. Instead, consistent with Title IX's language, the Supreme Court looked to when a funding recipient could be held liable and articulated the context inquiry under the "substantial control" over the context nexus. In doing so, the Court declined to frame the inquiry in terms of the disruption the harassment caused on campus, regardless of where it originated.

students) as proof that the University controlled the context of the harassment. But by itself, the University's ability to control its own wireless network says nothing about the University's ability to control the harassment on Yik Yak, a third-party app. Clearly, even if the University closed any access to Yik Yak via its network (a First Amendment error described above), Yik Yak would still be readily available and easily accessed anywhere on campus via the student's own electronic devices.

Using similar misdirection, the majority opinion suggests that the University could have controlled the context of the harassment by communicating its anti-harassment policies more effectively, or by holding assemblies or training to oppose cyberbullying and sexual harassment. *See* Maj. Op. 20. The notion of doing more to raise awareness and combat harassment—while a laudable goal—is irrelevant to *Davis'* context inquiry. To state the obvious, before delving into whether a funding recipient was deliberately indifferent or whether its response was clearly unreasonable, courts must first look at whether the funding recipient is appropriately subjected to a deliberate indifference claim under Title IX. That threshold requirement is satisfied only where the recipient exercised substantial control over the context of the known harassment, that is, the environment where it occurred. The efforts identified by the majority ignore that instruction.

Because the Complaint failed to plausibly allege facts that the University exercised control over Yik Yak or the means the harassers were using to access Yik Yak, the Complaint fails to meet the minimal pleading requirement that the University controlled the context of the harassment at issue in this case. And because a litigant must satisfy *Davis'* context inquiry in order to bring suit, the district court appropriately

82

granted the University's motion to dismiss for failure to state a deliberate indifference claim.

\* \* \* \*

Only by distorting and ignoring the original principles set out in *Davis* can the majority reach its preferred result, holding that the Complaint states a plausible claim of deliberate indifference against the University. The majority has repositioned the once high bar for a *Davis* claim to a new low. *See S.B.*, 819 F.3d at 76. As demonstrated, the Complaint does not contain factual allegations that satisfy *Davis*' harasser or context inquiries. And because the Complaint does not survive 12(b)(6) review concerning these threshold requirements for a deliberate indifference claim, there's no need to proceed further and consider whether the University's response was clearly unreasonable. The district court's decision to dismiss this claim should be affirmed.

## II.    Title IX: Retaliation

FMF's retaliation claim relies on two distinct acts: first, the University's alleged deliberate indifference to peer retaliatory harassment on Yik Yak, and, second, its alleged direct retaliation in disseminating a letter responding to FMF's administrative complaint (President Hurley's June 2015 letter). Neither ground pleads a viable claim, and I would affirm the district court's judgment dismissing them.

### A.

First, FMF asserts the University is liable under a Title IX retaliation claim based on its alleged deliberate indifference to retaliatory peer harassment. This type of imputed

83

retaliation claim has never been recognized by either the Supreme Court or any circuit court. The Supreme Court has recognized only that Title IX implicitly authorized a private right of action for the University's own retaliatory conduct. *Jackson*, 544 U.S. at 173–74 (holding that Title IX implicitly authorizes a private right of action against funding recipients who retaliate against a person for complaining of sex discrimination). Lacking binding authority or even persuasive circuit-court authority to support the viability of such a claim, the majority must instead cite a district court decision to hold that a plaintiff can pursue a retaliation claim based on a funding recipient's deliberate indifference to peer retaliation. *See* Maj. Op. 37. That recourse reflects the frailty of the majority's goal-oriented analysis.[11]

---

[11] Allowing a retaliation claim to proceed under the circumstances alleged in this case—where the later online harassment is largely part and parcel of the initially reported discriminatory online harassment—is problematic on several fronts. At the same time it recognized a cause of action for deliberate indifference to peer harassment, the Supreme Court disclaimed the argument that its decision meant that "recipients can avoid liability only by purging their schools of actionable peer harassment." *Davis*, 526 U.S. at 648. And it reiterated that funding recipients are not expected to "remedy peer harassment [or] ensure that students conform their conduct to certain rules." *Id.*. Recognizing new environments in which funding recipients can be held liable for deliberate indifference to ongoing harassment increases the circumstances in which their conduct may be deemed clearly unreasonable, and thus brings a court closer to ignoring *Davis*' limits on potential liability. In addition, recognizing a new cause of action distorts the "clearly unreasonable" analysis, increasing the risk of either over- or underemphasizing the recipient's response to particular peer conduct, rather than allowing one analysis of a recipient's response based on the totality of the circumstances it faced. There may be circumstances where the alleged retaliation looks substantially different from the initial reported discrimination, but when, as here, the conduct bleeds into each other, restraint is warranted.

Unlike the majority, however, it is unnecessary to conclusively determine when, or if at all, a retaliation claim based on deliberate indifference to retaliatory peer harassment could be recognized as a separate cause of action. Even assuming that such a claim may be viable in some circumstances, *Davis*' discussion of when a funding recipient can be held liable under a deliberate indifference theory would control the analysis. And, as noted, FMF's Complaint does not satisfy the necessary pleading requirements because it does not plausibly allege facts that would satisfy *Davis*' threshold harasser and context inquiries. Put simply, FMF relies on the same allegations to demonstrate the University's deliberate indifference for both claims, so the same analysis precludes both claims. I would affirm the district court's dismissal of the retaliation claim predicated on the University's deliberate indifference to peer retaliatory harassment and therefore dissent from the majority's contrary conclusion.

## B.

Second, FMF asserts that the University—through President Hurley—directly engaged in unlawful retaliation by disseminating a letter responding to FMF's administrative complaint filed with the U.S. Department of Education's Office of Civil Rights. I agree with the majority's observation that "an educational institution and its administrators are entitled to defend against accusations of discrimination" so long as that defense does not threaten or intimidate the complainant from pursuing the claim. Maj. Op. 38. I further agree with its conclusion that the allegations concerning the contents of President Hurley's letter do not cross that line. *See* Maj. Op. 38–41. I therefore concur

with the majority's decision to affirm the district court's dismissal of this part of FMF's retaliation claim.

### III.    42 U.S.C. § 1983: Equal Protection Claim

FMF also brought a § 1983-based equal protection claim against President Hurley, individually, based on his alleged deliberate indifference to peer sexual harassment. President Hurley defends both on the merits and by asserting qualified immunity. Because I agree that President Hurley is entitled to qualified immunity, I concur with the majority in affirming dismissal. I write separately, however, because the majority's speculative analysis goes well beyond the limited review needed to conclude that President Hurley's actions did not violate clearly established law.

Qualified immunity looks both to "whether a constitutional violation occurred" and "whether the right violated was clearly established at the time of the official's conduct." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013). Courts can consider the two prongs in either order, exercising discretion to determine which one "should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The majority's analysis of the first prong unnecessarily announces and opines on new and unsettled legal principles in this Circuit that has the effect, at best, of superfluous dicta. Specifically, the majority has to first consider whether a plaintiff alleging peer harassment can *ever* pursue an equal protection claim before then deciding whether an equal protection claim can be predicated on an official's alleged deliberate

86

indifference to peer sexual harassment. Only then could the majority decide whether FMF's Complaint sufficiently alleges that President Hurley's conduct violated FMF students' constitutional rights. None of this is ultimately dispositive. Such circumstances counsel against exercising our discretion to consider both prongs of the qualified immunity analysis for the reasons succinctly set out by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223 (2009): "There are circumstances in which the first step of the [qualified immunity analysis] may create a risk of bad decisionmaking." *Id.* at 239. In cases such as these, courts are well advised that addressing the "two-step protocol [in order] departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." *Id.* at 241. Unfortunately, the majority ignores these warnings and forges ahead.[12]

---

[12] Courts wanting to make a pronouncement of dicta can proceed in such circumstances, recognizing that the defendant, as the eventual prevailing party of the entire qualified immunity analysis, has neither incentive or ground to challenge the court's ultra vires diktat for the precise reasons predicted by the Supreme Court in *Pearson*:

> Rigid adherence to [addressing the analysis in order] may make it hard for affected parties to obtain appellate review of constitutional decisions that may have a serious prospective effect on their operations. Where a court holds that a defendant committed a constitutional violation but that the violation was not clearly established, the defendant may face a difficult situation. As the winning party, the defendant's right to appeal the adverse holding on the constitutional question may be contested. In cases like *Bunting* [*v. Mellen*, 541 U.S. 1019 (2004) (Scalia, J., dissenting from the denial of certiorari)], the prevailing defendant faces an unenviable choice: comply with the lower court's advisory dictum without opportunity to seek appellate or certiorari review, or defy the views of the lower court, adhere

(Continued)

I would not have engaged in such a lengthy discourse of untested theories of liability "because it 'unnecessarily resolves a difficult and novel question . . . that will have no effect on the outcome of the case.'" *See Ashcroft v. al-Kidd*, 563 U.S. 731, 751 (2011) (Sotomayor, J., concurring in the judgment) (declining to join the majority's analysis of the first prong of the qualified immunity analysis, and limiting her analysis to the second prong (quoting *Pearson*, 555 U.S. at 237 (alterations omitted))).

In contrast, here, the second prong's clearly established law analysis is straightforward: a reasonable official would not have understood that the actions alleged here violated the student plaintiffs' rights. Courts have described the second prong many ways, but "[a] right is clearly established if the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cox v. Quinn*, 828 F.3d 227, 238 (4th Cir. 2016). Put differently, for the law to be clearly established, officials must have "fair notice" that their conduct violated the plaintiff's constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002). FMF's complaint presses a novel combination of legal duties and rights. As the majority opinion discusses at greater length, neither controlling authority nor a robust consensus of persuasive authority provided President Hurley with fair notice that he violated FMF students'

---

to practices that have been declared illegal, and thus invite new suits and potential punitive damages.

*Pearson*, 555 U.S. at 240–41.

Apparently recognizing the opportunity to proclaim unreviewable dicta, the majority has proceeded with "bad decisionmaking." *Id.* at 239.

constitutional rights by responding as he is alleged to have done after receiving their reports of peer sexual harassment occurring on a third-party social media app. *See* Maj. Op. 51–57. As such, President Hurley is entitled to qualified immunity, and the district court properly dismissed this claim.

IV.

For the reasons set out above, I dissent from the majority's decision to reverse and remand FMF's Title IX deliberate indifference to peer discrimination and peer retaliatory harassment claims. I concur in its decision affirming dismissal of the part of FMF's retaliation claim based on President Hurley's June 2015 letter. And although I agree with its decision to affirm dismissal of the equal protection claim against President Hurley based on qualified immunity, I do so solely on the second prong of the analysis. In short, I would affirm the district court's judgment dismissing all of FMF's claims.

Make no mistake, the majority's novel and unsupported decision will have a profound effect, particularly on institutions of higher education, until the Supreme Court reaffirms that *Davis* means what it says. Institutions, like the University, will be compelled to venture into an ethereal world of non-university forums at great cost and significant liability, in order to avoid the Catch-22 Title IX liability the majority now proclaims. The University should not hesitate to seek further review.